900 F.2d 1164
 ROSEBUD SIOUX TRIBE, Appellant,
Cheyenne River Sioux Tribe, Intervenor,
Oglala Sioux Tribe, Standing Rock Sioux Tribe, Appellants,
v.
STATE OF SOUTH DAKOTA; George S. Mickelson, Governor;
Roger Tellinghuisen, Attorney General; Jim Jones,
Superintendent of the Highway Patrol, In
Their Official Capacities, Appellees.
ROSEBUD SIOUX TRIBE, Cheyenne River Sioux Tribe, Appellant,
Oglala Sioux Tribe and Standing Rock Sioux Tribe,
Intervenors-Plaintiffs Below,
v.
STATE OF SOUTH DAKOTA; George S. Mickelson, Governor;
Roger Tellinghuisen, Attorney General; Jim Jones,
Superintendent of the Highway Patrol, In
Their Official Capacities, Appellees.
ROSEBUD SIOUX TRIBE, Appellee,
Cheyenne River Sioux Tribe, Oglala Sioux Tribe, Standing
Rock Sioux Tribe, (Plaintiff/Intervenors Below) Appellees,
v.
STATE OF SOUTH DAKOTA; George S. Mickelson, Governor;
Roger Tellinghuisen, Attorney General; Jim Jones,
Superintendent of the Highway Patrol, In
Their Official Capacities, Appellants.
 Nos. 89-5227, 89-5228 and 89-5252.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1989.
Decided March 16, 1990.
Rehearing and Rehearing En Banc Denied June 8, 1990.
 
 William R. Perry, Washington, D.C., for appellants.
 Terry L. Pechota, Finch, Viken, Vicken & Pechota, Rapid City, S.D., for Rosebud Sioux Tribe.
 Marvin Amiotte, Pine Ridge, S.D., for Oglala Sioux Tribe.
 Scott McElroy, Boulder, Colo., for Cheyenne River Sioux Tribe.
 John P. Guhin, Pierre, S.D., for appellees.
 Before LAY, Chief Judge, McMILLIAN and WOLLMAN, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 This action was originally commenced by the Rosebud Sioux Tribe, later joined by the Cheyenne River Sioux Tribe, the Oglala Sioux Tribe and the Standing Rock Sioux Tribe (the Tribes), to enjoin the State of South Dakota from exercising civil and criminal jurisdiction over highways running through Indian land[1] in the state. The district court[2] upheld the state's assertion of jurisdiction. The Tribes have appealed; the state has cross-appealed the district court's finding that its jurisdiction is concurrent with tribal authorities. We find the district court erred. Absent tribal consent, we hold the State of South Dakota has no jurisdiction over the highways running through Indian lands in the state. We reverse and remand to the district court to enter judgment in favor of the Tribes.
 
 BACKGROUND
 
 2
 When South Dakota was admitted to the Union, an act of Congress required a disclaimer of jurisdiction over Indian land be included in the state constitution:
 
 
 3
 [T]he people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.
 
 
 4
 Act of Feb. 22, 1889, ch. 180, Sec. 4, 25 Stat. 676. See also S.D. Const. art. XXII; id., art. XXVI, Sec. 18.[3] In 1953, Congress modified the federal-tribal scheme of jurisdiction over Indian land to allow states to assume jurisdiction over Indians within the state. See Act of Aug. 15, 1953, ch. 505, 67 Stat. 588, codified in part at 18 U.S.C. Sec. 1162 (1988) (P.L. 280). While P.L. 280 allowed an express, immediate cession of jurisdiction to some states, see 18 U.S.C. Sec. 1162(a),[4] other states fell within the provisions of sections 6 and 7 of P.L. 280, which provided the option of assuming jurisdiction. Section 7 of P.L. 280 provided:
 
 
 5
 The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both as provided for in the Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislation, obligate and bind the State to assumption thereof.
 
 
 6
 P.L. 280, Sec. 7, 67 Stat. 588, 589, repealed by Act of Apr. 11, 1968, Pub.L. 90-284, Sec. 403, Title IV, 82 Stat. 73, 79.
 
 
 7
 South Dakota responded to the congressional offer of jurisdiction in 1957 with legislation accepting criminal and civil jurisdiction if the affected Tribes consented. See S.D. Codified Laws Ann. Secs. 1-1-12--16 (1985). Since tribal consent was not given, jurisdiction was never assumed under this law. In 1959, South Dakota enacted a statute assuming jurisdiction over highways jointly maintained with the federal government. See S.D. Codified Laws Ann. Sec. 1-1-17. The prerequisite to assumption of jurisdiction in this statute, that the roads be jointly maintained by the state and federal government, was never met. Thus, these statutes, which appear in the current codification of South Dakota's statutes,[5] remain inoperative. See In re High Pine, 78 S.D. 121, 99 N.W.2d 38 (1959).
 
 
 8
 In 1961, South Dakota enacted the legislation that is at issue in this case. This legislation accepted all civil and criminal jurisdiction, conditioned on federal reimbursement, with a notable exception:
 
 
 9
 The state of South Dakota, in accordance with the provisions of 67 Statutes at Large, page 589 (Public Law 280), hereby assumes and accepts jurisdiction of all criminal offenses and civil causes of action arising in the Indian country located within this state, as Indian country is defined by Title 18 United States Code, section 1151, and obligates and binds this state to the assumption thereof[.]
 
 
 10
 * * * *
 
 
 11
 Except as to criminal offenses and civil causes of action arising on any highways, as the term is defined in chapter 31-1, the jurisdiction provided for in Sec. 1-1-18 shall not be deemed assumed or accepted by this state, * * * unless and until the Governor of the state of South Dakota, if satisfied that the United States of America has made proper provision for the reimbursement to this state and its counties for the added costs in connection with the assumption of said jurisdiction, has issued his proper proclamation duly filed with the secretary of state declaring the said jurisdiction to be assumed and accepted.
 
 
 12
 S.D. Codified Laws Ann. Secs. 1-1-18, 1-1-21 (1985) (emphasis added) (1961 legislation). The general assumption of jurisdiction did not occur since the Governor of South Dakota never filed the required proclamation. A subsequent attempt in 1963 to assume complete civil and criminal jurisdiction without the federal reimbursement condition failed when the legislation was defeated in a referendum vote. See Act of Mar. 15, 1963, Ch. 467, 1963 S.D.Laws 522; S.D. Codified Laws Ann. Sec. 1-1-12 Commission Note (1985) (chapter 467 defeated in referendum vote by 3 to 1 margin).
 
 
 13
 The exception in the 1961 legislation purportedly allowed the state to exercise jurisdiction over highways in Indian country from 1961 forward. In 1964, however, the South Dakota Supreme Court invalidated the 1961 legislation. See In re Hankins, 80 S.D. 435, 125 N.W.2d 839 (1964). The court concluded the state's assumption of highway jurisdiction did not effectively remove the constitutional disclaimer because P.L. 280 did not permit a state to assume partial subject-matter jurisdiction. Id. at 442-43, 125 N.W.2d at 842-43. The 1961 legislation was never repealed but appears in the current official codification of the state laws. The state did not pursue highway enforcement efforts after the Hankins decision, and judicial decisions reflected the state's lack of jurisdiction over Indians on Indian land. See, e.g., State v. Molash, 86 S.D. 558, 199 N.W.2d 591 (1972); Smith v. Temple, 82 S.D. 650, 152 N.W.2d 547 (1967).
 
 
 14
 In 1968 Congress amended P.L. 280 to require tribal consent prior to any assumptions of jurisdiction. The pertinent language of the 1968 amendment reads as follows:
 
 
 15
 The consent of the United States is hereby given to any State not having jurisdiction over [civil or criminal causes of action] in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over [civil or criminal causes of action] as may be determined by such State to the same extent that such State has jurisdiction over [other civil or criminal causes of action] * * *.
 
 
 16
 * * * *
 
 
 17
 SEC. 403(a) The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to [P.L. 280], as it was in effect prior to its repeal by subsection (b) of this section.
 
 
 18
 (b) Section 7 of [P.L. 280] is hereby repealed, but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal.
 
 
 19
 Act of Apr. 11, 1968, Pub.L. 90-284, Title IV, Secs. 401-03, 82 Stat. 73, 78-79 (codified at 25 U.S.C. Secs. 1321(a), 1322(a), 1323 (1982)) (emphasis added). The tribal consent requirement did not apply to states that had assumed jurisdiction prior to the repeal of section 7. See Three Affiliated Tribes v. Wold Engineering, 467 U.S. 138, 150, 104 S.Ct. 2267, 2275, 81 L.Ed.2d 113 (1984).
 
 
 20
 In 1979 the United States Supreme Court decided Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). Yakima ruled that the Washington jurisdiction statute validly assumed partial jurisdiction under the pre-1968 version of P.L. 280. After Yakima, South Dakota began urging in state courts that it had validly assumed highway jurisdiction in the 1961 legislation. The 1961 legislation reappeared in the 1985 codification of state laws in response to Yakima.[6] The South Dakota Supreme Court in State v. Onihan, 427 N.W.2d 365 (S.D.1988) ruled that, in light of Yakima, Hankins was overruled; the court then concluded that the 1961 legislation was a valid assumption of jurisdiction over highways in Indian land. Onihan, 427 N.W.2d at 367-68. The Onihan court also found the 1968 tribal consent amendment did not apply since the state had validly assumed jurisdiction prior to the amendment. Id. at 367.
 
 
 21
 The Tribes filed this action in federal district court on May 14, 1986, seeking declaratory and injunctive relief restraining the state from exercising jurisdiction over highways on Indian land. The parties filed cross-motions for summary judgment. The district court denied the Tribes' motion, and granted summary judgment in favor of the state. The district court concluded the state validly assumed highway jurisdiction in 1961 and that the 1968 amendment did not apply to the state. Rosebud Sioux Tribe v. South Dakota, 709 F.Supp. 1502 (D.S.D.1989). The Tribes now appeal.
 
 DISCUSSION
 
 22
 The question before this court is whether South Dakota currently has civil and criminal jurisdiction over highways running through Indian land in the state. The fundamental issue is whether the state, which began re-asserting its jurisdiction over the highways after the 1979 Yakima decision, is bound by the 1968 amendment requiring consent of the affected Tribes. The Tribes argue that in 1968, when P.L. 280 was amended, the state did not have P.L. 280 jurisdiction and consequently was bound by the amendment. The Tribes rely principally on the statements and representations made by representatives of South Dakota before congressional committees considering the P.L. 280 amendments which suggest South Dakota had not assumed jurisdiction under the pre-amendment version of P.L. 280. The Tribes contend Congress relied on those representations and intended South Dakota be bound by the tribal consent amendment.
 
 
 23
 The state contends it is not bound by the 1968 amendment, arguing that it never lost the jurisdiction obtained in the 1961 legislation. The state advances two arguments to support this theory. First, P.L. 280 as originally enacted did not provide for a method by which states could retrocede, or give back, the jurisdiction assumed. Once South Dakota assumed jurisdiction, the state argues it could not lose it, notwithstanding the Hankins decision. Second, the state contends the only consistent resolution of this case is to find it validly assumed jurisdiction in 1961. To rule otherwise would be an implicit adoption of Hankins, which was overruled by Yakima and Onihan.
 
 
 24
 The district court, although distinguishing between the Washington jurisdiction statute in Yakima and South Dakota's statute, nonetheless found "it best to defer to the implicit holding of the South Dakota Supreme Court in State v. Onihan that the 1961 legislation remains an effective state statute notwithstanding its checkered history." Rosebud Sioux Tribe, 709 F.Supp. at 1509 (citations omitted). In doing so the district court noted that Hankins was wrongly decided and that the 1961 legislation was a sufficient "affirmative legislative action" of the state to allow assumption of P.L. 280 jurisdiction. Id. at 1510-12. On this basis the district court concluded that the 1968 tribal consent requirement was not applicable. Id. at 1513.
 
 
 25
 The validity of the state's jurisdiction presents difficult questions due to the unique sequence of events in this case. The Onihan court concluded that Hankins was essentially overruled by Yakima. We recognize the South Dakota Supreme Court's prerogative to declare its earlier decisions overruled, invalid or no longer possessing binding effect. However, where a state court's ruling is affected by its interpretation of federal law, this court may conduct a de novo review of that interpretation. See Three Affiliated Tribes, 467 U.S. at 153-54, 104 S.Ct. at 2277 (federal court can review state court decision influenced by its understanding of federal law).
 
 
 26
 It is important to distinguish between the state and federal law issues facing the Onihan court. The state law question concerns procedural compliance with P.L. 280, i.e., the procedure for removing a constitutional disclaimer. See, e.g., S.D. Const. art. XXII; see Yakima, 439 U.S. at 493, 99 S.Ct. at 757 (procedure for removing disclaimers is state law issue). The federal law question considers substantive compliance with P.L. 280, i.e., is the jurisdiction statute sufficient to accept Congress' offer of jurisdiction over Indians. The Onihan court addressed both issues in its decision. That court considered the remaining validity of Hankins in light of Yakima, overruled its prior decision, and then, applying Yakima retroactively, concluded that the 1961 legislation complied with the substantive requirements of P.L. 280. Onihan, 427 N.W.2d at 367-68. We address the issue of the substantive validity of the state's assertion of jurisdiction since it is for the federal court to determine whether a state's legislation complies with the federal requirements of P.L. 280. See, e.g., Tyndall v. Gunter, 840 F.2d 617, 618 (8th Cir.1988) (validity of retrocession of P.L. 280 jurisdiction is a federal law question); Omaha Tribe of Nebraska v. Village of Walthill, 334 F.Supp. 823, 831 (D.Neb.1971) (validity of state resolution retroceding P.L. 280 jurisdiction considered under federal law), aff'd, 460 F.2d 1327 (8th Cir.1972).
 
 
 27
 The South Dakota Supreme Court misinterpreted Yakima as controlling, and thus overruling its earlier decisions holding the state did not have P.L. 280 jurisdiction. We find error in this interpretation of Yakima. The differences between Washington's jurisdiction scheme and South Dakota's single subject-matter jurisdiction scheme require a more searching examination. Washington's statute assumed jurisdiction over eight different subject-matter areas,[7] and left open the possibility of full jurisdiction with the consent of the affected Tribe. The Yakima court found the state could "assume jurisdiction in such manner" as the people of the state shall "by affirmative legislative action, obligate and bind the State to assumption thereof." Yakima, 439 U.S. at 495, 99 S.Ct. at 758. The court also observed: "Whether or not "in such manner" is fully synonymous with "to such extent," the phrase is at least broad enough to authorize a State to condition the extension of full jurisdiction over an Indian reservation on the consent of the tribe affected." Id. at 498, 99 S.Ct. at 760 (emphasis added).
 
 
 28
 The Yakima court concluded that Washington's jurisdiction statute did not represent "an attempt to reap the benefits and to avoid the burdens of the jurisdictional offer made by Congress." Id. at 498, 99 S.Ct. at 760. As Yakima points out proof to the contrary was found in the state's offer to assume total jurisdiction whenever a tribal request is made that it do so.[8] Washington's scheme was responsive to the congressional concerns and intent that fostered P.L. 280 and left "substantial play for tribal self-government" in a way that "reflects a responsible attempt to accommodate the needs of both Indians and non-Indians within a reservation." Id. at 499, 99 S.Ct. at 760.
 
 
 29
 In contrast, South Dakota's jurisdiction scheme assumes civil and criminal jurisdiction over one limited area: highways, a subject-matter area that "arguably takes jurisdiction over perhaps the only part of law enforcement which comes close to being self-financing--i.e., enforcement of traffic laws." Rosebud Sioux Tribe, 709 F.Supp. at 1508.[9] The remainder of the 1961 amendment was an attempt to condition full jurisdiction over Indian lands on federal reimbursement.[10]
 
 
 30
 The major concerns reflected in the passage of P.L. 280 were (1) to reduce the economic burden of federal jurisdiction over reservations, (2) to respond to a perceived hiatus in law enforcement on reservations, and (3) to assimilate Indians into the general population. Yakima, 439 U.S. at 498, 99 S.Ct. at 760.
 
 
 31
 We believe South Dakota's limited excursion into the area of Indian jurisdiction is not responsive to the concerns underlying the passage of P.L. 280. Jurisdiction over highways does not go very far in reducing lawlessness on reservations, but simply introduces a third party to the already complex jurisdiction pattern on reservations.[11] It also does little to reduce federal presence on reservations since the federal government retains the financial burden of the majority of jurisdictional concerns. The Washington statute, which left open the possibility of complete jurisdiction upon tribal consent, reflected an acceptance of the burden of jurisdiction, as well as an attempt to accommodate tribal self-governance. The state's partial jurisdiction assumption here represents the contrary result.[12] We believe that the failure to assume jurisdiction in a manner consistent with the purposes of P.L. 280 is not sufficient "action within the terms of the offer made by Congress to the States in 1953." Yakima, 439 U.S. at 499, 99 S.Ct. at 760. See also Bryan v. Itasca County, 426 U.S. 373, 383-85, 96 S.Ct. 2102, 2108-09, 48 L.Ed.2d 710 (1976) (state not allowed to tax Indians on reservation since P.L. 280's grant of civil jurisdiction was not intended to allow states to impose regulatory laws on Indians); Kennerly v. District Court of Montana, 400 U.S. 423, 427, 91 S.Ct. 480, 482, 27 L.Ed.2d 507 (1971) (requirements of P.L. 280 must be strictly followed).
 
 
 32
 There exists a second and even more compelling reason for rejecting the state's partial assumption of jurisdiction as complying with P.L. 280. We find that the intent of Congress in 1968 in amending P.L. 280 to eliminate nonconsensual assumptions of jurisdiction prevents the state from attempting to assume jurisdiction through retroactive application of a new statutory interpretation.
 
 
 33
 We find support for this conclusion in the purposes that fueled the tribal consent amendment to P.L. 280. Congress signaled the adoption of a new policy regarding the relationship between Indians and federal and state governments that is reflected in the 1968 amendment, and which we believe cannot be defeated by the retroactive application of a change in statutory interpretation. P.L. 280 had been the subject of criticism for its failure to include a provision allowing affected Tribes a voice in determining which system of government would regulate them. See F. Cohen, Handbook of Federal Indian Law 177 (1983) (President Eisenhower signed P.L. 280, but requested Congress immediately amend the statute to include a tribal consent provision). Members of several different tribes consistently and continuously voiced their objection to the lack of a tribal consent provision in P.L. 280. See Hearings on H.R. 15419 And Related Bills Before the Subcommittee on Indian Affairs of the House Committee on Interior & Insular Affairs, 90th Cong., 2d Sess. 27 (1968).[13] The 1968 tribal consent amendment was a reflection of the principle that leaders must obtain the consent of those to be governed before assuming power. See Hearings Before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee, 89th Cong., 1st Sess. 4 (1965) (statement of Sen. McGovern). This amendment also reflected the shift in national policy toward Indians, from an assimilationist approach, to a policy promoting tribal self-governance and self-reliance. Goldberg, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians, 22 UCLA L.Rev. 535, 550 (1975).
 
 
 34
 Significantly, several representatives of South Dakota appeared before the congressional committee considering the amendment, and pronounced their support for a tribal consent provision. These representatives also described South Dakota as a non-P.L. 280 state, and declared that South Dakota accepted the principle that tribal consent was an important feature of a democratic system of government. See Hearings Before the Subcommittee of Constitutional Rights, supra (statement of South Dakota Assistant Attorney General Andre); Hearings on H.R.Res. 1100 Before the Committee on Rules of the House of Representatives, 90th Cong., 2d Sess. 2741 (1968) (statement of South Dakota Congressman Reifel). We cannot rely solely upon the statements of these representatives to find a congressional intent that South Dakota be bound by this amendment. We do believe, however, that the entire history of this amendment, including the representations made by these speakers, provides ample support for the conclusion that Congress intended to eliminate completely the ability of a state to assume jurisdiction, without tribal consent, at any time and in any manner after 1968.
 
 
 35
 We find further support for this conclusion in the repeal of the original section 7 of P.L. 280, which had allowed assumptions of jurisdiction without consent. It is clear that Congress intended to eliminate the possibility of future nonconsensual assumptions of jurisdiction by repealing the section under which such jurisdiction was obtained. This repeal did not affect those assumptions of jurisdiction that were already operative. See Act of Apr. 11, 1968, Pub.L. 90-284, Title IV, Sec. 403(b), 82 Stat. 73, 79 (codified at 25 U.S.C. Sec. 1323(b)). But the clear import of the repeal of section 7 was to signal Congress' disapproval of any further nonconsensual assumptions of jurisdiction, through any means.
 
 
 36
 We acknowledge the existence of the rule of law requiring a change in statutory interpretation to be applied retroactively. See United States v. Estate of Donnelly, 397 U.S. 286, 294-95, 90 S.Ct. 1033, 1038-39, 25 L.Ed.2d 312 (1970); McDonald v. Watt, 653 F.2d 1035, 1042 (5th Cir. Unit A Aug. 1981); Ettinger v. Central Penn Nat'l Bank, 634 F.2d 120, 124 (3d Cir.1980); Safarik v. Udall, 304 F.2d 944, 949-50 (D.C.Cir.), cert. denied sub nom., 371 U.S. 901, 83 S.Ct. 206, 9 L.Ed.2d 164 (1962); Jackson v. Harris, 43 F.2d 513, 516 (10th Cir.1930). This rule explains that "[t]he effect of the subsequent decisions is not to make a new law but only to hold that the law always meant what the court now says it means." Fleming v. Fleming, 264 U.S. 29, 31-32, 44 S.Ct. 246, 247, 68 L.Ed. 547 (1924). This rule must be evaluated, however, in light of the unique factual circumstances of this case, particularly the background leading up to the intervening congressional amendment.[14]
 
 
 37
 Although in a different context[15] the observation of the Supreme Court in Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), concerning the retroactive application of a decision holding a statute unconstitutional is relevant here. The court stated:
 
 
 38
 The actual existence of a statute, prior to [a determination of unconstitutionality] is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,--with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified.
 
 
 39
 Id. at 374, 60 S.Ct. at 318 (emphasis added).
 
 
 40
 The Chicot County court enunciated principles of non-retroactivity which we believe are applicable here. A decision overruling a previous construction of a statute is not given retroactive application where to do so disturbs the vested rights of the parties. See Massaglia v. Commissioner, 286 F.2d 258, 259 (10th Cir.1961); see also Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 87-88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982) (denying retroactive effect to decision where retroactive application would "visit substantial unjustice and hardship" upon litigants who relied on overruled provisions of Bankruptcy Act); Chevron Oil Co. v. Huson, 404 U.S. 97, 107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (retroactive application should be denied where substantially unequitable result occurs). We believe the Tribes had a vested right in the protection offered by the 1968 tribal consent amendment. A party does not, of course, have a vested right in a judicial decision, Estate of Donnelly, 397 U.S. at 295, 90 S.Ct. at 1038;[16] however, the Tribes' vested right here extends not from the ruling in Hankins but from the change in Congress' offer of jurisdiction to the states.
 
 
 41
 The Supreme Court has considered subsequent "jurisdictional history" in resolving claims of jurisdiction over Indians. See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 603-05, 97 S.Ct. 1361, 1371-73, 51 L.Ed.2d 660 (1977); DeCoteau v. District County Court, 420 U.S. 425, 442-43, 95 S.Ct. 1082, 1091-92, 43 L.Ed.2d 300 (1975). In Rosebud Sioux Tribe, which involved the disestablishment of reservation land, the Court supported its conclusion that earlier congressional acts disestablished the reservation by reviewing the longstanding pattern of jurisdiction over the land.
 
 
 42
 Since state jurisdiction over the area within a reservation's boundaries is quite limited, the fact that neither Congress nor the Department of Indian Affairs has sought to exercise its authority over this area, or to challenge the State's exercise of authority is a factor entitled to weight as part of the "jurisdictional history." The longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian * * * not only demonstrates the parties' understanding of the meaning of the Act, but has created justifiable expectations which should not be upset by so strained a reading of the Acts of Congress as petitioner urges.
 
 
 43
 430 U.S. at 603-05, 97 S.Ct. at 1371-73 (citations, footnotes omitted) (emphasis added). We believe retroactive application in this case would disrupt the Tribes' "justifiable expectations."
 
 
 44
 The Tribes, particularly in South Dakota, have relied on the protection offered by the tribal consent amendment since 1968. The Tribes have co-existed with state authorities with the knowledge that the state could not assume jurisdiction over them without their consent. The state allowed federal and tribal authorities to exercise jurisdiction prior to and after 1968 without asserting its claim to jurisdiction. Retroactive application of the Yakima interpretation of P.L. 280 to revive South Dakota's 1961 legislation would disregard the manner in which the Tribes and the state have structured their jurisdictional relationship.
 
 
 45
 The Supreme Court has consistently instructed that ambiguities in legislation affecting retained tribal sovereignty must be construed in favor of the Indians. Yakima, 439 U.S. at 484, 99 S.Ct. at 753; see also Bryan v. Itasca County, 426 U.S. at 386, 96 S.Ct. at 2110 (construing effect of legislation affecting Indians in light of "intervening legislative enactments"). This rule of construction becomes crucial when the effect of a retroactive statutory interpretation is considered.
 
 
 46
 There is no question that in the enactment of the tribal consent requirement the Tribes were provided a vested interest in self-government and were afforded congressional assurance that jurisdiction not previously assumed by the state could not be taken from them without their consent. At the time this amendment was passed the legislative history demonstrates that both the state and the Tribes announced that no jurisdiction had been assumed by the state prior to the 1968 amendment. We cannot ignore the dramatic shift in national policy toward Indians that is reflected by the tribal consent amendment. To allow the state's claim of jurisdiction would defeat the purpose of the 1968 amendment, and disregard the manner in which the parties have structured their relationship. South Dakota cannot take advantage of a change in statutory construction without also recognizing the intervening legislation imposing new prerequisites on assumptions of jurisdiction. Since South Dakota has not obtained the consent of the Tribes since 1968, its claim of jurisdiction, made only since the advent of Washington v. Yakima Indian Nation in 1979, is invalid.
 
 
 47
 In sum we hold that (1) the 1961 legislation did not validly provide for State jurisdiction over the highways within the terms of P.L. 280; (2) that the self-governmental interests of the Tribes had become vested at the time of the passage of the 1968 amendment and that it was improper to apply Yakima retroactively to hold that state jurisdiction had been assumed prior to the repeal of section 7 of P.L. 280 in 1968; and (3) that the congressional intent in passing the 1968 amendment did not contemplate that a subsequent, retroactive application of a change in statutory interpretation could alter South Dakota's lack of jurisdiction existing at the time of the repeal of section 7.
 
 
 48
 The judgment of the district court is vacated and judgment in favor of the plaintiffs in accord with this opinion is to be entered; the cross-appeal is ordered dismissed.
 
 
 
 [1]
 While the terms "Indian land" or "reservation" are used to identify the geographic area of jurisdiction, the more accurate term is "Indian country," defined as:
 Except as otherwise provided in sections 1154 and 1156 of this title the term "Indian country", as used in this chapter means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
 18 U.S.C. Sec. 1151 (1988).
 
 
 [2]
 The Honorable Donald Porter, United States District Judge for the District of South Dakota
 
 
 [3]
 Similar disclaimers were adopted in the state constitutions of Washington, Montana, North Dakota, Utah, Oklahoma, Arizona, and New Mexico as a condition of their admittance to the Union. See Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 479 & n. 23, 99 S.Ct. 740, 750 & n. 23, 58 L.Ed.2d 740 (1979)
 
 
 [4]
 California, Minnesota, Nebraska, Oregon, Wisconsin, and Alaska were the "mandatory" states to which jurisdiction was immediately ceded. See 18 U.S.C. Sec. 1162
 
 
 [5]
 The commentary following section 1-1-12 notes that these statutes are not repealed but possibly viable: "The case of Washington v. Confederated Bands and Tribes of Yakima Indian Nation, * * * may change one or more of the interpretations of these statutes, so they are being reprinted until further disposition is made of them." S.D. Codified Laws Ann. Sec. 1-1-12, Commission Note
 
 
 [6]
 The 1961 legislation was not included in the 1974 codification of state laws
 
 
 [7]
 See Yakima, 439 U.S. at 475-76, 99 S.Ct. at 748-49:
 Full criminal and civil jurisdiction to the extent permitted by Pub.L. 280 was extended to all fee lands in every Indian reservation and to trust and allotted lands therein when non-Indians were involved. Except for eight categories of law, however, state jurisdiction was not extended to Indians on allotted and trust lands unless the affected tribe so requested. The eight jurisdictional categories of state law that were thus extended to all parts of every Indian reservation were in the areas of compulsory school attendance, public assistance, domestic relations, mental illness, juvenile delinquency, adoption proceedings, dependent children, and motor vehicles.
 
 
 [8]
 The Supreme Court expanded on this theme by observing:
 [T]he partial geographic and subject-matter jurisdiction that exists in the absence of tribal consent is responsive to the law enforcement concerns that underlay the adoption of Pub.L. 280. State jurisdiction is complete as to all non-Indians on reservations and is also complete as to Indians on nontrust lands. The law enforcement hiatus that preoccupied the 83d Congress has to that extent been eliminated. On trust and restricted lands within the reservations whose tribes have not requested the coverage of state law, jurisdiction over crimes by Indians is, as it was when Pub.L. 280 was enacted, shared by the tribal and Federal Governments. To the extent that this shared federal and tribal responsibility is inadequate to preserve law and order, the tribes need only request and they will receive the protection of state law.
 We are unable to conclude that the State, in asserting a less intrusive presence on the Reservation while at the same time obligating itself to assume full jurisdictional responsibility upon request, somehow flouted the will of Congress. A State that has accepted the jurisdictional offer in Pub.L. 280 in a way that leaves substantial play for tribal self-government, under a voluntary system of partial jurisdiction that reflects a responsible attempt to accommodate the needs of both Indians and non-Indians within a reservation, has plainly taken action within the terms of the offer made by Congress to the States in 1953. For Congress surely did not deny an option State the power to condition its offer of full jurisdiction on tribal consent.
 Id. at 498-99, 99 S.Ct. at 760-61.
 
 
 [9]
 The Tribes question the extent of the state's presence on the highways. Current litigation in South Dakota courts challenges the authority of the state, under the 1961 legislation, to enforce compulsory insurance laws against Indians traveling on reservation highways, and the state's authority to proceed beyond the geographic boundary of its jurisdiction, highways, to arrest a tribal member for a traffic offense
 
 
 [10]
 In commenting on the negative impact of the 1961 legislation, a legislative research staff report pointed out that the 1961 law "allowed assumption of total jurisdiction if the federal government assumed all costs involved. However, the federal government has not done this, and there appears to be almost no chance that it will." Staff Report, Jurisdiction Over Indian Country in South Dakota, at 7 (S.D. Legis. Research Council, Mar. 5, 1964)
 
 
 [11]
 There was no shown hiatus in law enforcement on highways within the reservation, but such a hiatus clearly existed in other areas of the law. See Staff Report, supra at 7: "The Interim Investigating Committee subsequently concluded that lack of jurisdiction in the matters of juvenile affairs, domestic relations and institutional commitments in Indian Country seriously hindered the efficient operation of public welfare programs." As the report further points out, there already existed sharing agreements affording some state control over the highways
 As a practical matter, despite the Hankins ruling, South Dakota does maintain some control of law and order on the public highways running through Indian reservations, through agreements on procedures among the respective tribal councils, the U.S. Bureau of Indian Affairs, and the office of the State Attorney General representing the Highway Patrol. Under these agreements, in order to eliminate legal questions of jurisdiction, highway patrolmen and tribal agents are "cross-commissioned" so their power of arrest cannot be challenged in court. The patrolmen police the highways as they do elsewhere in the state. Indians arrested by them are turned over to tribal courts; non-Indians will be tried in state courts.
 Id.
 
 
 [12]
 South Dakota urges here on appeal, contrary to the district court's findings, that the Tribes should not even share in concurrent jurisdiction
 
 
 [13]
 The Indians' objection to nonconsensual assumptions of jurisdiction was based on a belief in tribal sovereignty; a fear of discriminatory operation of state jurisdiction; and disagreement with the ouster of functioning systems of tribal government. See Goldberg, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians, 22 UCLA L.Rev. 535, 544-45 (1975)
 
 
 [14]
 Professor Calabresi has observed that the review of old statutes requires consideration of post-enactment changes to determine "how the statute fits in the current legal fabric and * * * what has happened to that fabric since the statute was passed." G. Calabresi, A Common Law for the Age of Statutes 129 (Harv. Univ. Press 1982)
 
 
 [15]
 In Chicot County the court was concerned with the collateral attack of an earlier judgment, and principles of res judicata. The Bank brought suit to recover against bonds on which the drainage district had defaulted. The district pled as res judicata an earlier judgment approving a plan of readjustment, which barred debts, such as the Bank's, that had not been presented in the debt readjustment proceedings. The Bank attacked the validity of that judgment since a different court had ruled unconstitutional the statute under which the earlier court had acted. 308 U.S. at 372-74, 60 S.Ct. at 318-19. The court ruled that, notwithstanding the subsequent determination of unconstitutionality, the validity of the earlier judgment was not open to collateral attack. Id. at 376-77, 60 S.Ct. at 319-20
 
 
 [16]
 The Supreme Court pointed out in Estate of Donnelly that the government is entitled to follow what it believes is the correct interpretation of a statute, "and to reap the benefits of that adherence if it proves to be correct[.]" Id. 397 U.S. at 294, 90 S.Ct. at 1038. The Court retroactively applied a change of law in Estate of Donnelly in part because of the government's adherence to the position the Supreme Court eventually adopted. Id. at 295, 90 S.Ct. at 1038. Here, however, the state not only did not adhere to its claim of jurisdiction, it acquiesced in the Hankins ruling as demonstrated by the position it took during the congressional hearings on the tribal consent amendment