2004 SD 56

**STATE of South Dakota, Plaintiff and Appellant,**

v.

**Nicholas CUMMINGS, Defendant and Appellee.**

No. 22936.

Supreme Court of South Dakota.

Argued Feb. 17, 2004.

Decided April 21, 2004.

Lawrence E. Long, Attorney General, John P. Guhin, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellant.

Rena M. Atchison of Abourezk Law Firm, Rapid City, South Dakota, Attorney for defendant and appellee.

SABERS, Justice.

[¶ 1.] The State filed a petition for permission to take a discretionary appeal on July 31, 2003. The Court granted the petition on August 28, 2003. The State argues that the magistrate court abused its discretion by suppressing all evidence gathered by a state law enforcement officer after going onto the Pine Ridge Indian Reservation in pursuit of a tribal member. We affirm.

## FACTS

[¶ 2.] Nicholas Cummings, the Defendant, is a member of the Oglala Sioux Tribe and he resides on the Tribe's Pine Ridge Reservation. The reservation is in Shannon County. Fall River County adjoins Shannon County. On March 4, 2003, Deputy Sheriff Steven McMillin was traveling west when he observed Cummings traveling east on U.S. Highway 18 in Fall River County. Cummings was traveling 71 miles per hour in a 65 mile per hour zone. The deputy turned his vehicle around and began following Cummings. While still in Fall River County, the deputy observed the vehicle cross the yellow line. The deputy activated his lights and Cummings increased his speed to 90 miles per hour. The deputy gave chase. At the time the chase commenced, the vehicles were approximately two miles from the border of Shannon County and the reservation. The deputy pursued Cummings onto the reservation. Once he crossed onto the reservation, Cummings began to slow down and he stopped approximately one mile within the border.

[¶ 3.] The deputy exited his car, weapon drawn. He placed Defendant on his knees, handcuffed him, and brought him to the front of the patrol car. Once the deputy confirmed Cummings' identification, he removed the handcuffs. The deputy's recorder in his cruiser captured a conversation between the deputy and Defendant wherein Defendant stated that he had been drinking.

[¶ 4.] The deputy did not have a warrant to enter the reservation, and he failed to request permission from tribal authorities to enter the reservation. He did, however, advise authorities, through his dispatcher, that he was in pursuit and would be crossing onto the reservation. The Defendant was charged in state court with speeding and eluding.

[¶ 5.] After hearing arguments and taking testimony on Defendant's motion to suppress, the magistrate held that *State v. Spotted Horse*, 462 N.W.2d 463 (S.D.1990) required suppression of all evidence the officer obtained after he entered the reservation. Everything the officer observed before the Defendant went on the reservation was held admissible. The State appeals raising one issue:

Whether a state officer in fresh pursuit for a traffic violation may pursue a tribal member onto his reservation and gather evidence from the driver when the alleged crimes were committed off the reservation.

We affirm.

## STANDARD OF REVIEW

[¶ 6.] We review a trial court's grant or denial of a motion to suppress

under the abuse of discretion standard. *State v. Engesser*, 2003 SD 47, ¶ 15, 661 N.W.2d 739, 746 (additional citation omitted). The trial court's findings of fact are reviewed under the clearly erroneous standard of review, but the application of a legal standard to those facts is a question of law, which we review de novo. *State v. Hodges*, 2001 SD 93, ¶ 8, 631 N.W.2d 206, 209.

[¶ 7.] **Whether a state officer in fresh pursuit for a traffic violation may pursue a tribal member onto his reservation and gather evidence from the driver when the alleged crimes were committed off the reservation.**

[¶ 8.] In *State v. Spotted Horse*, we faced a similar factual scenario. Spotted Horse, an enrolled member of the Standing Rock Sioux Tribe, who resided on the reservation, was observed driving a vehicle that did not display valid license plate stickers. *Spotted Horse*, 462 N.W.2d at 464. A Mobridge city police officer attempted to stop Spotted Horse while still in Mobridge. He gave chase and after a high speed pursuit, Spotted Horse finally came to a stop in his own driveway at his home on the reservation. After a violent scuffle, Spotted Horse was arrested and taken back to Mobridge. *Id.* On the way back to Mobridge, the officer smelled alcohol. The officer administered a field sobriety test at the police station, which Spotted Horse failed. Spotted Horse agreed to take a blood test and was ultimately charged with driving under the influence, eluding police, resisting arrest, driving without a license and failure to display current registration. *Id.* at 465. He was convicted of driving under the influence and failure to display current registration. *Id.* On appeal, this Court considered whether the police officer was permitted to pursue Spotted Horse onto the reservation and whether the State had jurisdiction to try Spotted Horse.

[¶ 9.] In holding that the State had jurisdiction to try Spotted Horse, we explained South Dakota's jurisdiction over reservations within the state. For the purpose of clarity, we will briefly discuss that history here. Under Public Law 280, passed by the United States Congress in 1953, states which had constitutions or statutes disclaiming jurisdiction over Indian Country were given statutory power to assume and exercise civil and criminal jurisdiction over reservations. *Id.* at 466. South Dakota was such a "disclaimer state." *See* S.D. Const. Art. XXII (providing in part, "we, the people inhabiting the state of South Dakota, do agree and declare that we forever disclaim all right and title to . . . all lands lying within said limits owned or held by any Indian or Indian tribes[.]") In 1961, the South Dakota Legislature attempted to accept partial jurisdiction over Indian Reservations under Public Law 280. In *Spotted Horse*, we reversed a previous holding that the State could assert such partial jurisdiction. Relying on *Rosebud Sioux Tribe v. South Dakota*, 900 F.2d 1164 (8th Cir.1990), we agreed that the State lacked Public Law 280 jurisdiction because that legislation "did not validly retrocede jurisdiction to the state within the terms of PL 280" and because "South Dakota's limited excursion into the area of Indian jurisdiction [was] not responsive to the concerns underlying the passage of PL 280." *Spotted Horse*, 462 N.W.2d at 467 (citing *Rosebud Sioux Tribe*, 900 F.2d at 1170–71). Furthermore, because Congress amended Public Law 280 in 1968 to require tribal consent prior to any new assertion of jurisdiction, South Dakota was precluded from enforcing its 1961 legislation. This was so because, "the Tribes, particularly in South Dakota, have relied on the protection offered by the tribal consent amendment since 1968." *Id.* Since the State had no

jurisdiction on the reservation, we held that our fresh pursuit statute "could not reach onto the reservation" and the arrest of Spotted Horse was illegal. *Id.*

[¶ 10.] Despite the illegality of Spotted Horse's arrest, we held that the trial court had jurisdiction to try the defendant. *Spotted Horse,* 462 N.W.2d at 467.[1] However, we suppressed all of the evidence gathered by the officer while he was on the reservation on the grounds that it was the fruit of an illegal arrest. *Id.* at 469 (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Despite the suppression of that evidence, we upheld the conviction for failure to display current registration. We reasoned that this was an offense committed off the reservation, and that proof of the offense was independently obtained through the officer's observations before the illegal arrest. *Id.*

[¶ 11.] As previously noted, the trial court relied on our holding in *Spotted Horse* to suppress all of the evidence obtained by the officer after he followed Cummings onto the reservation. State asserts that the trial court erred in relying on *Spotted Horse* and disregarding the United States Supreme Court's holding in *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Our review of *Hicks* reveals that its holding does not apply in this case and that the language the State relies upon in support of its argument is insufficient to allow such an incursion on tribal sovereignty, especially without specific direction from the United States Congress or a clear holding by a majority of the Supreme Court.

[¶ 12.] By its own terms, the holding of *Hicks* does not apply in this case. The Supreme Court phrased the issue in that case as:

> [W]hether a *tribal court may assert jurisdiction over civil claims against state officials* who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation.

*Hicks,* 533 U.S. at 355, 121 S.Ct. at 2308, 150 L.Ed.2d at 405 (emphasis supplied). Here, the question is whether a state officer may pursue a tribal member onto a reservation for a traffic offense without a warrant or tribal permission. The key distinction is that in *Hicks,* the Tribe was attempting to extend its jurisdiction over state officials by subjecting them to claims in tribal court. Here, the State is attempting to extend its jurisdiction into the boundaries of the Tribe's Reservation without consent of the Tribe or a tribal-state compact allowing such jurisdiction. In other words, in *Hicks,* tribal sovereignty was being used as a sword against state officers. Here, tribal sovereignty is being used as a shield to protect the Tribe's sovereignty from incursions by the State. *See* Frankie Sue Del Papa, C. Wayne Howle, Federal Bar Association Indian Law Conference: Reaffirming Tribal Sovereignty in an Era of Judicial Activism, Distilling the Essence of Nevada v. Hicks: The State's Perspective, 65.[2] This is significant because historically, the Federal Government has been highly protective of the Tribes' right to be free from harm and

1. The Court in *Spotted Horse* noted that the question whether the state court had jurisdiction over the defendant presented a "very close case." *Spotted Horse,* 462 N.W.2d at 468. The opinion implies that the Court was inclined to reconsider the rule stated therein under different facts. We need not do so in this case as neither party has questioned whether the state court had jurisdiction to try this case.

2. Frankie Sue Del Papa was Nevada's Attorney General and represented the state in *Hicks.*

interference by states. *Id.; See also, Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

[¶ 13.] Furthermore, while it is not necessary that a case be factually identical in order for it to provide binding precedent, we find that *Hicks* is factually distinguishable. Hicks was a member of the Fallon Paiute–Shoshone Tribes of Nevada. Based on suspicion that Hicks killed a California big horn sheep off the reservation, the state game warden obtained state and tribal court search warrants for Hicks' home. Hicks claimed that sheep heads in his home were damaged and that the search of his home exceeded the bounds of the warrant and brought suit in tribal court against Tribe and State officers. He claimed trespass, abuse of process and civil rights violations. His claims were brought under 42 U.S.C. § 1983. On appeal, only his suit against state officials in their individual capacity was at issue. The tribal court held that it had jurisdiction over the claims. State officials and the state filed an action in federal district court seeking a declaratory judgment that the tribal court lacked jurisdiction. The district court granted summary judgment in favor of Hicks and the Ninth Circuit Court of Appeals affirmed. The Supreme Court reversed.

[¶ 14.] State quotes expansively from the lead opinion in *Hicks,* which was written by Justice Scalia. State asserts that by necessity, the Court held that states have inherent jurisdiction on reservations such that state officers are entitled to enter a reservation for enforcement purposes. The State pulls extensively from a portion of Justice Scalia's writing that indicates that "process of state courts may run into an Indian reservation ... where the subject matter or controversy is otherwise within their cognizance." *Hicks,* 533 U.S. at 363, 121 S.Ct. at 2312, 150 L.Ed.2d at 410. Starting from this proposition, the main writing goes on to state:

It is also well established in our precedent that States have criminal jurisdiction over reservation Indians for crimes committed (as was the alleged poaching in this case) off the reservation.

*While it is not entirely clear* from our precedent whether the last mentioned authority entails the corollary right to enter a reservation (including Indian-fee lands) for enforcement purposes, several of our opinions point in that direction. *Hicks,* 533 U.S. at 362–63, 121 S.Ct. at 2312, 150 L.Ed.2d at 410 (internal quotation omitted) (emphasis supplied). As the State points out, the Court went on to note:

Nothing in the federal statutory scheme prescribes, or even remotely suggests, that state officers cannot enter a reservation (including Indian-fee land) to investigate or prosecute violations of state law occurring off the reservation.

State contends that these statements by the Court are determinative of the question before this Court. We disagree.

[¶ 15.] First, the Supreme Court was, of course, correct in noting that nothing in the statutory schemes it cited *denies* the State jurisdiction. However, this Court has already determined that our State never effectively asserted jurisdiction over the reservations in South Dakota. Nothing in current federal enactments has overruled the general proposition that the State has no jurisdiction to act on the reservations in South Dakota. It is difficult to maintain the proposition that the State, after having failed to effectively assert jurisdiction when given the opportunity by Congress, now suddenly gains that jurisdiction through no action of the State or the Tribe.

[¶ 16.] Furthermore, the Court's statements in *Hicks* are insufficient to overrule our decision in *Spotted Horse.* The statements noted above cannot be deemed

"holdings" or conclusions necessary to the decision in *Hicks*. The statements are dicta.[3] In addition, it appears that only two Justices joined that portion of Justice Scalia's reasoning. Six justices disagreed with the reasoning in the portion of *Hicks* from which these quotes originate.[4]

[¶ 17.] Finally, the question in *Hicks* was whether the tribal court had jurisdiction over state officers acting in their individual or official capacity on tribal land. *Hicks* should be construed to address that question only, and in fact, several federal courts have done so. *See e.g., McDonald v. Means,* 309 F.3d 530 (9th Cir.2002); *MacArthur v. San Juan County,* 309 F.3d 1216 (10th Cir.2002); *United States v. Archambault,* 174 F.Supp.2d 1009 (D.S.D. 2001); *Fidelity and Guaranty Insurance Co. v. Bradley,* 212 F.Supp.2d 163 (W.D.N.C.2002). The question whether a state officer in fresh pursuit for a crime committed off the reservation has jurisdiction to enter the reservation without tribal permission or a warrant was not squarely before the Court. We decline to usurp the power of the United States Congress to make laws with respect to Native American rights and sovereignty and the authority of the Supreme Court to interpret those laws by relying on dicta from a factually and legally distinguishable case.

■ [¶ 18.] The holding of *Spotted Horse* controls our decision. State has presented no authority or argument other than *Hicks* as a basis for overruling *Spotted Horse*. In the absence of a compact between the Tribe and the State, the state officer was without authority to pursue Cummings onto the reservation and gather evidence without a warrant or tribal consent. Therefore, all evidence gathered after the officer entered the reservation was properly suppressed. As in *Spotted Horse,* everything the officer observed before entering the reservation, including the Defendant's alleged speed and attempt to elude the officer, was admissible. Affirmed.

[¶ 19.] GILBERTSON, Chief Justice, and KONENKAMP, and MEIERHENRY, Justices, concur.

[¶ 20.] ZINTER, Justice, concurs specially.

ZINTER, Justice (concurring specially).

[¶ 21.] The State requests that we overrule *State v. Spotted Horse,* 462 N.W.2d 463 (S.D.1990) (holding that the State has no jurisdiction to pursue an Indian onto an Indian reservation for criminal offenses committed off the reservation). *Spotted Horse* has two underpinnings. The State does not request that we reconsider the first *Spotted Horse* underpinning, which overruled *State v. Onihan,* 427 N.W.2d 365 (S.D.1988), and held that the

---

3. This is demonstrated by Justice Souter's special writing reaching the same result with different analysis.

4. Justice Souter, with whom Justices Kennedy and Thomas joined, stated, "[w]hile I agree with the Courts analysis as well as its conclusion, I would reach that point by a different route." He went on to clarify his reasoning, stating, "[b]ut while the Court gives emphasis to measuring tribal authority here in light of the State's interest in executing its own legal process to enforce state law governing off-reservation conduct [ ] I would go right to

*Montana's* rule that a tribe's civil jurisdiction generally stops short of nonmember defendants." *Hicks,* 533 U.S. at 375, 121 S.Ct. at 2318, 150 L.Ed.2d at 418.

Justice O'Connor, with whom Justices Stevens and Breyer joined, flatly rejected Justice Scalia's analysis in this portion of his writing, stating that it was "unmoored from our precedents." *Hicks,* 533 U.S. at 387, 121 S.Ct. at 2324, 150 L.Ed.2d at 425.
Therefore, as indicated, only two justices concurred with that portion of the language and reasoning of the lead opinion upon which the State relies in this case.

State lacked Public Law 280 "jurisdiction over highways running through the reservations." *Spotted Horse*, 462 N.W.2d at 467. Instead, the State requests that we reconsider *Spotted Horse's* second underpinning, which broadly held that "South Dakota had no jurisdiction on the reservation," and therefore, hot pursuit could not reach onto the reservation to pursue and arrest a tribal member. *Id.* at 468–69. As a result of this second underpinning, *Spotted Horse* concluded that a state officer's arrest on the reservation is illegal (i.e. a constitutional violation), and any evidence derived from that arrest is inadmissible. The State asks us to reconsider this second underpinning of *Spotted Horse* solely because of language in the United States Supreme Court's recent decision in *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Although I join much of the Court's decision declining to apply *Hicks* to *Spotted Horse*, I write specially to explain my view of this case.

[¶ 22.] First, I join the Court's analysis of *Hicks* insofar as it points out the legal and factual distinctions between the civil jurisdiction asserted by the tribal court over non-members in *Hicks* and the State's assertion of criminal jurisdiction over a tribal member in the case at bar. *Supra* ¶¶ 11–14. This fundamental distinc-

tion is a significant barrier to *Hicks's* application in this case.

[¶ 23.] However, having said that, I must also concede that much of the language of Justice Scalia's opinion (*see supra* ¶ 14) suggests that the second underpinning of *Spotted Horse* was wrongly decided.[5] This conclusion is hardly surprising because, even in the absence of *Hicks*, the other states that have considered this issue conclude that a state has criminal jurisdiction in this situation. *See State ex rel. Old Elk v. District Court*, 170 Mont. 208, 552 P.2d 1394, 1396 (1976) (rejecting the contention that an arrest was illegal because it was made pursuant to a state arrest warrant and was executed by a state officer on an Indian person within the boundaries of an Indian reservation); *State v. Lupe*, 181 Ariz. 211, 889 P.2d 4, 6 (1994), *review denied* (Feb. 22, 1995) (concluding that a state properly exercised jurisdiction for an offense committed outside the reservation by an Apache tribal member who was pursued into, and arrested within, the reservation).[6] Therefore, I would not categorically dismiss the State's arguments.

[¶ 24.] I must also part company with the Court's observation that only two Justices joined Justice Scalia's "reasoning" in *Hicks*. *See supra* ¶ 16. I disagree because three Justices explicitly concurred in

**5.** In addition to the language noted by the majority at ¶ 14, the Supreme Court also noted:

Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as "sovereign" entities, it was "long ago" that "the Court departed from Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries." "Ordinarily," it is now clear, "an Indian reservation is considered part of the territory of the State."

*Hicks*, 533 U.S. at 361–62, 121 S.Ct. 2304 (internal citations omitted).

[T]ribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to "the right to make laws and be ruled by them." The State's interest in execution of process is considerable, and even when it relates to Indian-fee lands it no more impairs the tribe's self-government than federal enforcement of federal law impairs state government.

*Id.* at 364, 121 S.Ct. 2304.

**6.** As in these decisions, the record in this case reflects no extradition agreement for the misdemeanor offenses involved. Therefore, the argument of interference with reservation Government discussed in *Benally v. Marcum*,

Justice Scalia's and Chief Justice Rehnquist's "analysis as well as its conclusions," *Hicks*, 533 U.S. at 375, 121 S.Ct. 2304 (Souter, J., concurring) (joined by Justice Kennedy and Justice Thomas). Furthermore, Justice Ginsburg concurred in the opinion. *Id.* at 386, 121 S.Ct. 2304 (stating "I join the Court's opinion"). Thus, six members of the Court joined Justice Scalia's language, and therefore, the State is correct that much of *Hicks's* reasoning foreshadows an eventual reversal of the second underpinning of *Spotted Horse.*[7]

[¶ 25.] Nevertheless, I join the Court because of the fundamental distinction between *Hicks's* core issue of *tribal* jurisdiction over *non*-members and *Spotted Horse's* core issue of *state* criminal jurisdiction over *tribal* members. In light of this difference, it is simply too far a stretch to now conclude that *Hicks requires* a reversal of the second underpinning of *Spotted Horse.* Furthermore, it must be recognized that this Court's own view of this jurisdictional subject is not a model of stability. The Court's opinion has changed the last two times the jurisdictional issue has been considered. *See In re Hankins*, 80 S.D. 435, 125 N.W.2d 839 (1964) (no jurisdiction); *Onihan*, 427 N.W.2d 365 (jurisdiction, impliedly overruled *Hankins*); and *Spotted Horse*, 462 N.W.2d 463 (no jurisdiction, overruled *Onihan*). Because this Court has equivocated on the jurisdiction question in the past, it remains prudent for this Court to follow Justice O'Connor's procedural course of following our "best source of 'coherence in the various manifestations of the general law of [Indian jurisdiction][.]' " *Hicks*, 533 U.S. at 388, 121 S.Ct. 2304 (quoting *Atkin-*

*son Trading Co., Inc. v. Shirley*, 532 U.S. 645, 121 S.Ct. 1825, 1828–29, 149 L.Ed.2d 889 (Souter, J., concurring)). This course is especially appropriate because the Supreme Court specifically declined to review this Court's last word on the subject in *Spotted Horse*, 462 N.W.2d 463, *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

[¶ 26.] Therefore, I conclude that *Hicks* is not sufficiently compelling today to require a reversal of course yet a third time. In the absence of a clearer directive from the Supreme Court or a different request for reconsideration, I believe that stability and predictability in the law require our adherence to *Spotted Horse.*

---

89 N.M. 463, 553 P.2d 1270 (N.M.1976), is not present here.

**7.** I also part company with the Court's broad conclusion that a compact between a tribe and the State is necessary before a state officer may engage in pursuit of a tribal member

onto the reservation for a crime committed off the reservation. *See supra* ¶ 18. I do so because the United States Supreme Court's jurisprudence clearly permits some state jurisdiction in some situations where there is no compact.