#29010-r-SRJ
**2021 S.D. 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellant,

    v.

MORGAN CUMMINGS,                    Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
BENNETT COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BOBBI J. RANK
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

STACY R. HEGGE
Assistant Attorney General
Pierre, South Dakota

SARAH E. HARRIS
Bennett County State's Attorney
Martin, South Dakota                    Attorneys for plaintiff and
    appellant.


TERRY L. PECHOTA
Rapid City, South Dakota                    Attorney for defendant and
    appellee.

* * * *

ARGUED
FEBRUARY 11, 2020
OPINION FILED **01/27/21**

#29010

JENSEN, Chief Justice

[¶1.]　　　　Agents from the South Dakota Division of Criminal Investigation and the Bureau of Indian Affairs spoke with Morgan Cummings and his father Charlie Cummings at their home located on Indian trust land concerning property crimes that had occurred outside Indian country.[1]  Morgan and Charlie agreed to speak with the officers and produced evidence implicating Morgan in a burglary in Bennett County.  Morgan was later charged in state court.  The circuit court granted Morgan's motion to suppress statements he made to a state officer, determining that the officer lacked authority to investigate crimes in Indian country.  We granted the State's petition for intermediate appeal of the circuit court's order suppressing Morgan's statements.  We now reverse the circuit court's decision.

**Facts and Procedural History**

[¶2.]　　　　In January 2017, various state law enforcement agencies were investigating recent burglaries and thefts that had occurred outside Indian country in Martin, South Dakota.  Morgan Cummings was a suspect.  Morgan was eighteen at the time and lived with his father, Charlie Cummings, in Sunrise Housing; which

---

1.　　　Indian country is defined in 18 U.S.C. § 1151 and includes all land within any Indian reservation, dependent Indian communities, and Indian allotments for which "Indian titles . . . have not been extinguished . . . ."  The United States Supreme Court has held "that the test for determining whether land is Indian country does not turn upon whether that land is denominated 'trust land' or 'reservation.'  Rather, we ask whether the area has been 'validly set apart for the use of the Indians as such, under the superintendence of the Government.'"  *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511, 111 S. Ct. 905, 910, 112 L. Ed. 2d 1112 (1991) (quoting *United States v. John*, 437 U.S. 634, 648-49, 98 S. Ct. 2541, 2549, 57 L. Ed. 2d 489 (1978)).

is in Indian country on the east side of Martin.[2]  On January 9, 2017, at approximately 1:15 p.m., Special Agent Rasmussen of the South Dakota Division of Criminal Investigation (DCI) and Special Agent Hooper of the Bureau of Indian Affairs (BIA) went to the Cummings' house to investigate the burglaries and thefts. DCI Special Agent Patterson was also present, but he did not testify; and there is no showing that he possessed any federal authority in Indian country.

[¶3.]        As a BIA officer, Agent Hooper was authorized to investigate and make arrests for crimes committed in Indian country and "serve warrants, summonses, or other orders relating to a crime committed in Indian country . . . ."  25 U.S.C. § 2803.  Agent Hooper was also authorized "when requested, [to] assist . . . any Federal, tribal, State, or local law enforcement agency in the enforcement or carrying out of the laws or regulations the agency enforces or administers."  *Id.* Agents Rasmussen and Hooper were members of the Northern Plains Safe Trails Drug Enforcement Task Force.  Agent Rasmussen was federally deputized to investigate drug offenses in Indian country pursuant to 21 U.S.C. § 801 et. seq.

[¶4.]        Upon approaching the Cummings' residence, the officers knocked on the front door.  Charlie answered, and the officers identified themselves as drug task force officers, said they were investigating recent burglaries and thefts that had occurred outside Indian country, and asked to speak to Morgan.  Charlie

---

2.    There was no direct evidence or finding by the circuit court that the Cummings are members of a federally recognized Indian tribe or otherwise qualify as Indians under federal law.  On appeal, the State concedes the Cummings' Indian status, though it acknowledges uncertainty about whether they are members.  We assume for the purpose of our analysis that the Cummings are Indians under federal law.

invited the officers in and woke Morgan. Morgan agreed to follow Agent Rasmussen out to Rasmussen's vehicle to talk. The vehicle was unlocked, and Morgan sat in the passenger seat. He was told that he was free to leave at any time. Morgan and Agent Rasmussen talked for twenty minutes. During the conversation, Morgan made certain admissions, including admitting to taking a saddle that the officers were investigating as stolen. He agreed to show Agent Rasmussen where the saddle was located in the basement.

[¶5.]     While Morgan and Agent Rasmussen were outside, Agent Hooper discussed the stolen items they were looking for with Charlie and asked for consent to search the home. Charlie offered to show the officers the items that had been described. Charlie led Agent Hooper to a saddle and saddle blanket, along with other items. Those items were placed in a pile in the kitchen. When Morgan and Agent Rasmussen returned to the house, Agent Rasmussen asked Morgan to show him where other stolen items were located; and Morgan did so. After all the items were collected, Charlie and Morgan both signed a consent to search form.

[¶6.]     Morgan was indicted for third-degree burglary, grand theft, and intentional damage to property in state court. He moved to suppress his statements and the items provided to law enforcement, claiming law enforcement's actions violated the Fourth and Fifth Amendments to the United States Constitution. Specifically, Morgan argued Agent Rasmussen did not have the authority to question him in Indian country, his statements were involuntary, and the search was not consensual. Following an evidentiary hearing, the circuit court suppressed Morgan's statements relying exclusively on our decisions in *State v. Spotted Horse*,

462 N.W.2d 463 (S.D. 1990), and *State v. Cummings*, 2004 S.D. 56, 679 N.W.2d 484, to conclude that Agent Rasmussen did not have authority to investigate state criminal offenses in Indian country. The court refused to suppress the physical evidence, determining that Agent Hooper had investigative authority within Indian country as a BIA officer and that Charlie's decision to voluntarily produce the physical evidence was an intervening event that removed the taint of Agent Rasmussen's interview of Morgan.

[¶7.] The circuit court denied the State's motion for reconsideration following a hearing, but the circuit court clarified its ruling by determining that Morgan's statements to Agent Rasmussen were voluntary.[3] The State petitioned for intermediate appeal from the circuit court's ruling, raising the sole issue of whether the court erred in suppressing Morgan's statements.

### Standard of Review

[¶8.] "We review the circuit court's grant or denial of a motion to suppress involving an alleged violation of a constitutionally protected right under the de novo standard of review." *State v. Smith*, 2014 S.D. 50, ¶ 14, 851 N.W.2d 719, 723. We review the circuit court's findings of fact for clear error, but conclusions of law are given no deference. *Id.*

### Analysis and Decision

[¶9.] The State argues that the circuit court erred in relying on our decisions in *Spotted Horse* and *Cummings* to conclude that Morgan's statements must be

---

3. Morgan has not sought review of the circuit court's ruling that his statements to Agent Rasmussen were voluntary or the denial of his motion to suppress with respect to the physical evidence.

-4-

suppressed "[b]ecause Agent Rasmussen was without authority to conduct the investigation in Indian country." The State argues *Spotted Horse* and *Cummings* are inapplicable because the officers were lawfully present at the Cummings' home and the interaction between the officers and the Cummings was entirely consensual. The State also claims that nothing prohibited Agent Rasmussen from going to the Cummings' home in Indian country to investigate crimes that occurred off the reservation and cite *Nevada v. Hicks*, which recognized the authority of state officers to enter Indian country to investigate and enforce off-reservation crimes. 533 U.S. 353, 121 S. Ct. 2304, 150 L. Ed. 2d 398 (2001). Alternatively, the State asks that we reverse the holdings of *Spotted Horse* and *Cummings*.

[¶10.]        Morgan relies upon the continued applicability of *Spotted Horse* and *Cummings*. He argues that Agent Rasmussen had no authority to enter Indian country and engage in any law enforcement activity without authorization from tribal authorities. As a result, Morgan maintains that the State cannot rely on consent given by him or his father because Agent Rasmussen was not legally present at the Cummings' home when he requested consent to search and speak with Morgan.

[¶11.]        *Spotted Horse* and *Cummings* both arose from similar facts. In each case, a state law enforcement officer observed a tribal member commit a state motor vehicle offense outside of Indian country. The state law enforcement officer pursued the driver into Indian country at high speeds until the driver eventually stopped. The state officer in each case then arrested and transported the tribal member out of Indian country to face charges in state court.

[¶12.]	In *Spotted Horse*, the Court relied on *Ker v. Illinois*, 119 U.S. 436, 7 S. Ct. 225, 30 L. Ed. 421 (1886), to deny a challenge to the state court's jurisdiction to hear the case, but held the "seizure of [the defendant] by [the officer] was clearly a violation of [the defendant's] Fourth Amendment rights . . . ." 462 N.W.2d at 468-69. *Spotted Horse* viewed the officer's "actions in pursuing [the defendant] down the reservation highway, into the housing area and onto his front lawn to be a constitutional violation, far above simple statutory violations" and held "that the evidence attained by the unconstitutional arrest is not admissible against [the defendant]." *Id.* at 469.

[¶13.]	*Cummings* reaffirmed the holding in *Spotted Horse*, that the arrest of the defendant in Indian country violated the Fourth Amendment, and affirmed a circuit court's order suppressing evidence obtained from the arrest. *Cummings*, 2004 S.D. 56, ¶ 18, 679 N.W.2d at 489. This Court also rejected the State's argument that *Nevada v. Hicks* effectively nullified *Spotted Horse*. *Id.* ¶ 16.

[¶14.]	In *Hicks*, the United States Supreme Court determined a tribal court did not have jurisdiction to adjudicate tort claims arising from a state officer's execution of a state search warrant. The warrant authorized a search of the plaintiff's home on a reservation for evidence pertaining to an off-reservation crime. 533 U.S. at 357, 364, 121 S. Ct. at 2309, 2313. Applying accepted Indian law jurisdictional principles, the Court recognized that states may exercise some legal process and authority on Indian fee land:

> Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation . . . . Though tribes are often referred to as "sovereign" entities, it was "long ago" that

"the Court departed from Chief Justice Marshall's view that the laws of a State can have no force within reservation boundaries."

*Id.* at 361, 121 S. Ct. at 2311 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141, 100 S. Ct. 2578, 2582, 65 L. Ed. 2d 665 (1980)). "To the contrary, the principle that Indians have the right to make their own laws and be governed by them requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.'" *Id.* at 362, 121 S. Ct. at 2311 (quoting *Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 156, 100 S. Ct. 2069, 2083, 65 L. Ed. 2d 10 (1980)).

[¶15.]    In determining the tribal court lacked jurisdiction over the tort claim against the state officer, *Hicks* concluded:

> that tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to "the right to make laws and be ruled by them." The State's interest in execution of process is considerable, and even when it relates to Indian-fee lands it no more impairs the tribe's self-government than federal enforcement of federal law impairs state government . . . . Nothing in the federal statutory scheme prescribes, or even remotely suggests, that state officers cannot enter a reservation (including Indian-fee land) to investigate or prosecute violations of state law occurring off the reservation. To the contrary, 25 U.S.C. § 2806 affirms that "the provisions of this chapter alter neither . . . the law enforcement, investigative, or judicial authority of any . . . State, or political subdivision or agency thereof."

*Id.* at 364, 366, 121 S. Ct. at 2313.

[¶16.]    Nonetheless, *Cummings* concluded *Hicks* was inapplicable to law enforcement's actions involving the hot pursuit and forcible arrest of the defendants in Indian country, stating "[*Hicks*'] holding does not apply in this case and that the language the State relies upon in support of its argument is insufficient to allow

such an incursion on tribal sovereignty, especially without specific direction from the United States Congress or a clear holding by a majority of the Supreme Court." *Cummings*, 2004 S.D. 56, ¶ 11, 679 N.W.2d at 487. *Cummings* also concluded *Hicks* was distinguishable because "in *Hicks*, tribal sovereignty was being used as a sword against state officers. Here, tribal sovereignty is being used as a shield to protect the Tribe's sovereignty from incursions by the State." *Id.* ¶ 12. As such, *Cummings* viewed the language from *Hicks* to be dicta and questioned whether a majority of the *Hicks* Court had joined in this language. *Id.* ¶ 16.

[¶17.] Justice Zinter specially concurred in *Cummings*, agreeing that *Hicks* was factually and legally distinguishable from *Cummings*. However, he "concede[d] that much of the language of Justice Scalia's opinion . . . suggests that the second underpinning of *Spotted Horse* [that a state officer has no jurisdiction on the reservation] was wrongly decided." *Id.* ¶ 23 (Zinter, J., concurring). The special writing also took issue with the assertion that a majority of the Court in *Hicks* had not joined this language. *Id.* ¶ 24. Justice Zinter, however, concurred with the majority opinion resolving that *Hicks* was not sufficiently compelling to require a reversal of course yet a third time and "believe[d] that stability and predictability in the law require our adherence to *Spotted Horse*." *Id.* ¶ 26.

[¶18.] Consistent with Justice Zinter's concurring opinion in *Cummings*, our review convinces us that a majority of the *Hicks* Court joined Justice Scalia's opinion discussing state officers' authority to investigate state crimes in Indian country. Since *Cummings*, at least two other courts have also concluded that six members of the *Hicks* Court joined the applicable language. *State v. Clark*, 178

Wash. 2d 19, 28-29, 308 P.3d 590, 595 (2013) ("Six members of the Court signed the majority opinion in full; none of these justices withheld their signatures from Part II, the portion discussing the execution of the search warrants."); *State v. Harrison*, 2010-NMSC-038, ¶ 26, 148 N.M. 500, 509, 238 P.3d 869, 878 ("Thus, a majority of the Court joined the analysis regarding state authority to investigate off-reservation crimes committed by Indians in Indian country.").

[¶19.]     Contrary to our statement in *Cummings*, we now view the language of *Hicks* —recognizing the ability of state officers to lawfully enter Indian country to investigate "violations of state law occurring off the reservation" —to be authoritative and controlling. *Hicks*, 533 U.S. at 366, 121 S. Ct. at 2313. Further, *Hicks* unquestionably recognizes state law enforcement officers' authority to enter into Indian country to investigate state crimes alleged to have been committed by Indians off the reservation. Applying *Hicks* to this case leads to the inescapable conclusion that Agent Rasmussen did not violate any jurisdictional principles by entering Indian country to investigate crimes that occurred outside Indian Country. Agent Rasmussen simply knocked on the door of the Cummings' home and engaged in a voluntary encounter with Morgan and his father about a crime committed outside Indian country.[4]

---

4.     Apart from *Spotted Horse* and *Cummings*, Morgan has not identified any decisions supporting his claim that the state officers' actions in this case infringed upon tribal sovereignty. Morgan cites *United States v. Anderson*, which held that a parole search of a tribal member's apartment by state parole agents was invalid because the parole agents lacked criminal jurisdiction to conduct a warrantless search in Indian country. 857 F. Supp. 52, 54 (D.S.D. 1994). *Anderson* cited *Spotted Horse* for the principle that state officers have no jurisdiction in Indian country, but acknowledged there

(continued . . .)

[¶20.]     Other courts have also recognized that law enforcement has some degree of authority to enter Indian country to investigate and prosecute state crimes committed outside Indian country. In considering whether the actions of state law enforcement officers violate tribal sovereignty, these courts have considered the degree to which the state action infringed on tribal self-governance. *E.g.*, *Clark*, 178 Wash. 2d at 26, 308 P.3d at 594; *Harrison*, 2010-NMSC-038, ¶ 23, 148 N.M. at 508, 238 P.3d at 877; *State v. Mathews*, 133 Idaho 300, 312-13, 986 P.2d 323, 335-36 (1999); *State ex rel. Old Elk v. Dist. Court In & For Big Horn Cnty.*, 170 Mont. 208, 214-15, 552 P.2d 1394, 1397-98 (1976); *State v. Lupe*, 181 Ariz. 211, 214, 889 P.2d 4, 6–7 (Ct. App. 1994). "The general consensus among our sister states regarding a state officer's authority to investigate off-reservation crimes in Indian country also is supported by *Hicks*, which held that 'state sovereignty does not end at a reservation's border,' because 'an Indian reservation is considered part of the territory of the State.'" *Harrison*, 2010-NMSC-038, ¶ 24, 148 N.M. at 508, 238 P.3d at 877 (quoting *Hicks*, 533 U.S. at 361-62, 121 S. Ct. 2304).

[¶21.]     We have previously applied the infringement test in civil cases to test the limits of a state court's exercise of its jurisdiction over Indians and matters arising in Indian country. Before asserting jurisdiction, we ask whether the exercise of jurisdiction in a particular case "would infringe on the right of reservation Indians to make their own laws and be ruled by them." *Alone v. C. Brunsch, Inc.*, 2019 S.D. 41, ¶ 14, 931 N.W.2d 707, 711 (quoting *Williams v. Lee*,

---

(. . . continued)

was not "a case directly on point." *Id.* However, *Anderson* was decided prior to *Hicks* and did not involve a consensual encounter.

358 U.S. 217, 220, 79 S. Ct. 269, 271, 3 L. Ed. 2d 251 (1959)). In considering "the infringement test, we assess the interests of the tribal and federal governments on the one hand, and those of the State, on the other. Under this standard, whether all defendants named in this action are member Indians or tribal entities and whether the [activity] occurred within the confines of Indian country are highly relevant in determining whether the exercise of jurisdiction will infringe on tribal self-government." *Id.* ¶ 15 (citations omitted).

[¶22.]     Here, Morgan fails to identify how Agent Rasmussen infringed upon any legitimate interest of a tribal government by entering Indian country to investigate a crime that occurred off the reservation. While Morgan is Indian, there is no claim that Agent Rasmussen's actions adversely impacted the ability of any tribal government to make its own laws and be governed by them. Agent Rasmussen did not attempt to execute any formal state process or non-consensual enforcement activities in Indian country. Further, Morgan's alleged criminal conduct occurred outside Indian country and involved matters of state criminal jurisdiction, over which the tribe has no authority. *Cf. id.* ¶ 18 (holding the assertion of state jurisdiction would infringe on tribal sovereignty where the tribal court had jurisdiction over claims occurring on the reservation against member Indians and a tribal entity). Morgan has not identified any case suggesting that Agent Rasmussen infringed on tribal sovereignty by engaging him in an informal, consensual encounter in Indian country concerning state criminal violations. Moreover, in assessing the infringement claim, we consider it to be significant that Agent Rasmussen was accompanied by a BIA officer who is authorized by federal

statute to "assist . . . any Federal, tribal, State, or local law enforcement agency in the enforcement or carrying out of the laws or regulations the agency enforces or administers." 25 U.S.C. § 2803.

[¶23.] Morgan argues, however, that the circuit court properly relied on the language from *Cummings* to determine that Agent Rasmussen was without authority to enter Indian country to investigate state crimes. Specifically, he points to the Court's statement in *Cummings*, made in the context of the facts before it, that "the state officer was without authority to pursue [the defendant] onto the reservation and gather evidence without a warrant or tribal consent." 2004 S.D. 56, ¶ 18, 679 N.W.2d at 489. For the reasons previously expressed, this overly broad language from *Cummings* is inconsistent with *Hicks* and stands in contravention to the decisions of other courts. As such, this language has no application to Agent Rasmussen's actions investigating the crimes committed outside Indian country in this case.[5] Morgan has failed to show that Agent Rasmussen lacked authority to investigate state offenses while in Indian country, or that his actions infringed upon tribal sovereignty.

[¶24.] Morgan has also failed to show a Fourth Amendment or other constitutional violation that would support the suppression remedy granted by the circuit court. We acknowledge that *Spotted Horse* and *Cummings* relied on the

---

5. The actions of Agent Rasmussen are markedly different than those addressed in *Spotted Horse* and *Cummings*, which involved the hot pursuit of tribal members suspected of state law violations into Indian country. We need not decide today whether the actions of the state law enforcement officers in such cases infringe upon tribal sovereignty, or the appropriate remedy for any such infringement.

Fourth Amendment to order the evidence in those cases to be suppressed. Specifically, *Spotted Horse* and *Cummings* determined that state officers violated the Fourth Amendment by entering Indian country, without authorization to do so, to make an illegal arrest of a tribal member. Neither decision cited any other authority to support its holding that the State's infringement on tribal sovereignty invoked the protections of the Fourth Amendment. In re-examining both decisions, we conclude that *Spotted Horse* and *Cummings* incorrectly conflated jurisdictional principles associated with tribal sovereignty and individual rights afforded by the Fourth Amendment.

[¶25.] It is well-established that the Fourth Amendment protects the privacy interests of individuals and tests "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1878-79, 20 L. Ed. 2d 889 (1968). "[A]n individual must have a reasonable expectation of privacy in the place searched or the article seized before the Fourth Amendment will apply." *Cordell v. Weber*, 2003 S.D. 143, ¶ 12, 673 N.W.2d 49, 53. Neither *Spotted Horse* nor *Cummings* identified any individual privacy interest or expectation of privacy of a defendant that law enforcement violated. Rather, the "illegal arrest" was premised on the conflict between the exercise of state criminal jurisdiction and the extent of the State's infringement on sovereign tribal government. Apart from *Spotted Horse* and *Cummings*, we find no cases holding that a state officer's infringement on tribal sovereignty implicates individual privacy interests under the Fourth Amendment.

[¶26.] There is, however, well-established caselaw to support the conclusion that Agent Rasmussen's actions are well within the "knock and talk" doctrine discussed by the United States Supreme Court in *Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013). The "knock and talk" doctrine applies to the home and the area immediately around the home, and "recognize[s] that 'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.'" *Id.* at 8, 133 S. Ct. at 1415 (quoting *Breard v. Alexandria*, 341 U.S. 622, 626, 71 S. Ct. 920, 95 L. Ed. 1233 (1951)). *Jardines* explained that "[t]his implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.*, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 563 U.S. 452, 469, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011)). "If consent is freely given, it makes no difference that an officer may have approached the person with the hope or expectation of obtaining consent." *King*, 563 U.S. at 463, 131 S. Ct. at 1858.

[¶27.] We also conclude that there was no seizure of Morgan's person for Fourth Amendment purposes. A seizure occurs under the Fourth Amendment when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991) (quoting

*Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S. Ct. 1975, 1977, 100 L. Ed. 2d 565 (1988)). "[N]ot every encounter between a citizen and the police constitutes a Fourth Amendment seizure." *State v. Iversen*, 2009 S.D. 48, ¶ 9, 768 N.W.2d 534, 536. The Fourth Amendment is not violated when an encounter between law enforcement and an individual is consensual. *Jardines*, 569 U.S. at 8, 133 S. Ct. at 1415; *King*, 563 U.S. at 463, 131 S. Ct. at 1858.

[¶28.] The circuit court did not find that Morgan was seized by Agent Rasmussen, but rather found that the entire encounter was consensual. Morgan does not challenge the circuit court's determination on appeal or claim that the conversation between Morgan and Agent Rasmussen was a custodial interrogation. Thus, Morgan has failed to show a Fourth Amendment violation. *See Jones v. Norton*, 809 F.3d 564, 573-74 (10th Cir. 2015) (determining there was no Fourth Amendment violation by a state officer on an Indian reservation when there is no evidence that the officer seized a tribal member).

[¶29.] The circuit court's order suppressing Morgan's statements is reversed. We remand to the circuit court for further proceedings.

[¶30.] KERN, SALTER, and MYREN, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶31.] DEVANEY, Justice, deeming herself disqualified, did not participate.

[¶32.] MYREN, Justice, participating in his official capacity as a Circuit Court Judge when this case was submitted to the Court, sitting for DEVANEY, Justice, disqualified.