#30507-a-MES
**2024 S.D. 36**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

HARRY DAVID EVANS,                                    Petitioner and Appellant,

v.

DANIEL SULLIVAN, Warden of the
South Dakota State Penitentiary,                     Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
CUSTER COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOSHUA HENDRICKSON
Judge

* * * *

JOHN R. MURPHY
Rapid City, South Dakota                 Attorney for petitioner and
                                         appellant.


MARTY J. JACKLEY
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                     Attorneys for respondent and
                                         appellee.

* * * *

CONSIDERED ON BRIEFS
APRIL 23, 2024
OPINION FILED **06/26/24**

#30507

SALTER, Justice

[¶1.] Harry David Evans is serving a life sentence in prison after a jury convicted him of six criminal offenses, including kidnapping, rape, burglary, assault, stalking, and violating a protection order. He filed a writ of habeas corpus setting forth nine claims, most of which alleged ineffective assistance of counsel in connection with his underlying criminal trial. He also alleged violations of his rights to due process and to be free of unreasonable searches and seizures. The habeas court granted the State's motion to dismiss three of Evans' claims on the basis of res judicata because they were effectively resolved in Evans' direct appeal. After an evidentiary hearing, the court denied the remaining claims and dismissed Evans' request for habeas relief. The court issued a certificate of probable cause, and Evans appeals. We affirm.[1]

## Factual and Procedural Background

### The crime

[¶2.] After the breakup of her marriage, S.B. was living alone on an 11-acre property in Pennington County where she kept horses and other animals. She met Evans on an online dating site in 2016, and the two connected over their love for animals. They soon began an arrangement under which Evans helped S.B. care for her horses in exchange for a place to stay. But this employment-type arrangement

---

1. Evans previously appealed after the habeas court issued an earlier certificate of probable cause following its res judicata ruling that resolved some but not all of Evans' claims. We dismissed the appeal because it was not a final order. *See* SDCL 21-27-18.1 (limiting review in habeas cases to "final order[s]" for which a certificate of probable has been issued).

-1-

quickly developed into a romantic relationship that, in time, became tumultuous and was characterized by its on-again-off-again nature.

[¶3.] In December 2016, Evans trapped S.B. in her basement after she confronted him about having his mail delivered to her home. Evans threatened to kill both S.B. and himself, but S.B. was able to escape and called the police. Shortly after, another incident occurred during which Evans again threatened S.B., this time giving her three choices: "You are either going to make love to me or I will rape you or I will murder you."

[¶4.] After a similar incident, Evans was arrested and charged with simple assault and false imprisonment. S.B. later called Evans' attorney, Elizabeth Frederick, in an effort to assist Evans. S.B. told Frederick that Evans was only trying to prevent S.B. from driving while intoxicated. S.B expressed that she wanted to have the charges against Evans dropped. Frederick told S.B. to call the state's attorney, and, though the details surrounding the disposition of the case are not completely clear in the record, it does appear that the charges were ultimately dismissed.

[¶5.] S.B. began limiting her contact with Evans, although she did not want to abruptly end contact with him out of fear that doing so might anger him. When S.B. moved from her Rapid City home, she temporarily stayed in a camper while a new modular home was moved to an acreage she had purchased near Hermosa. Though she initially testified that the relationship with Evans was over at this point, she acknowledged on cross-examination that they had been intimate "a few times" while she was staying in the camper.

[¶6.]        S.B. also agreed that she had accepted Evans' help in connection with her move to her new Hermosa home.  However, she testified that Evans became angry with her after learning that she had not placed him on the deed to the recently purchased Hermosa real estate.  According to S.B., any expectation that she would add Evans to the deed was unjustified, and she was alarmed by his reaction.  She decided to end the relationship and advised Evans not to return to the Hermosa property.  However, Evans did not accept her decision and, according to S.B., he began to harass her with calls and text messages.  Before she had moved into the Hermosa house but after the modular home was located on the property, she discovered that Evans had been staying there after finding his clothing and a sleeping bag during a visit to the property.  S.B. explained that she then obtained a protection order, acting on the advice of a local law enforcement officer.

[¶7.]        But despite the protection order, Evans continued to contact S.B., mainly in the form of harassing calls and texts.  S.B. contacted the police who placed game cameras around S.B.'s property.

[¶8.]        On September 5, 2017, S.B. contacted police after receiving an unsettling message from Evans.  Hermosa Town Marshal Jim Daggett went out to S.B.'s home and searched the surrounding acreage in an unsuccessful effort to find Evans.  Daggett told S.B. he would return in the morning.  S.B. then poured herself a glass of wine, opened her bathroom window slightly, and took a bath.  Forgetting to close the window, she took a sleeping pill and went to bed around 1:15 a.m.

[¶9.]        Around the same time, Evans had parked his partially spray-painted pickup down the road from S.B.'s home and made his way to S.B.'s house along a

cattle path. He eventually positioned himself beneath the open bathroom window while S.B. was taking a bath. After she went to sleep, he cut the screen from the window and gained entry into her house.

[¶10.] S.B. was awakened by Evans beside her. He began wrapping her in duct tape and gave S.B. three familiar options: "she could make love to him, he could rape her, or he would kill her and himself." Evans then forced multiple sleeping pills into S.B.'s mouth before placing duct tape across her mouth. S.B. drifted in and out of consciousness as Evans wrapped her in a blanket, dragged her out of her house, loaded her into her SUV, and drove her off her property before returning to her home and dragging her back inside.

[¶11.] At some point, S.B. became aware that she was back in her bed while Evans cut the duct tape from her body with a hunting knife and raped her. S.B. lost consciousness again, and when she awoke, Evans ordered her to take him to his truck. He threatened to kill her friends and her animals if she told anyone about what had happened.

[¶12.] When Marshal Daggett returned to S.B.'s home that morning, S.B. did not at first tell him about the rape. But, sensing something was amiss, Daggett continued to ask S.B. if something had happened, and S.B. told him about the incident. Other officers responded and began looking for Evans.

[¶13.] Law enforcement officers eventually located Evans' truck at a hotel and casino on the Pine Ridge Indian Reservation. State officers sought assistance from their tribal counterparts who met them at the hotel where they learned that Evans had checked into a room. After unsuccessful efforts to contact Evans, tribal

officers entered his room where they found him in bed, incoherent, with an empty bottle of S.B.'s prescription medication beside him. Officers arrested Evans and seized his truck, from which they collected evidence.

[¶14.] Evans was indicted and pled not guilty to six counts: second-degree rape, first-degree kidnapping, aggravated assault, stalking, violation of a protection order, and first-degree burglary. After a five-day trial, a jury found Evans guilty on all six counts.

### The direct appeal

[¶15.] Evans appealed his convictions, which we affirmed in a 2021 decision. *See State v. Evans (Evans I)*, 2021 S.D. 12, 956 N.W.2d 68. As it relates to the habeas case before us, we considered the following three issues in *Evans I*: (1) whether the circuit court erred by denying Evans' motion to suppress evidence based upon the assertion state law enforcement officers did not have jurisdiction to seize Evans' property on the Pine Ridge Indian Reservation, (2) whether the circuit court's deviation from jury selection statutes constituted structural error; and (3) whether the circuit court abused its discretion under SDCL 19-19-404(b) (Rule 404(b)) when it admitted other acts evidence relating to events involving his ex-wife that occurred during their marriage.[2] *Id.* ¶ 1, 956 N.W.2d at 74.

[¶16.] We rejected Evans' challenge to the circuit court's denial of his suppression motion, noting that the United States Supreme Court has held that "the state's execution of a state warrant on a reservation for the violation of state

---

2. We also considered whether the circuit court abused its discretion when it admitted a law enforcement officer's testimony about the nature of S.B.'s injuries. *Evans I*, 2021 S.D. 12, ¶¶ 54–59, 956 N.W.2d at 88–89.

laws occurring off the reservation does not impair the tribe's right to self-govern." *Id.* ¶ 51, 956 N.W.2d at 87 (citing *Nevada v. Hicks*, 533 U.S. 353, 364, 121 S. Ct. 2304, 2312, 150 L. Ed. 2d 398 (2001)). Evans is not an Indian under federal law, the crimes occurred outside of Indian country, and the seized property belonged to Evans. *Id.* ¶ 52, 956 N.W.2d at 88. Moreover, the state officers investigating the case acted with the permission and assistance of tribal officers in a cooperative law enforcement effort. Therefore, we held that there was no "possible conclusion that the exercise of jurisdiction by state officers would infringe on tribal self-government." *Id.*[3]

[¶17.] We also rejected Evans' arguments relating to jury selection and the circuit court's decision to allow other acts evidence. As to the former, Evans argued that the circuit court deviated from the jury selection process described in SDCL chapter 23A-20 when, instead of allowing challenges for cause, the court, acting on its own, summarily excused prospective jurors. *Id.* ¶ 38, 956 N.W.2d at 83. Evans did not object to the court's procedure at trial, but he argued on appeal that the court's procedure constituted structural error. *Id.* We disagreed, noting that the court was not statutorily prohibited from asking case-specific questions and that

---

3. In his submissions, Evans references the Fourth Amendment prohibition against unreasonable searches and seizures. However, the authority of a state law enforcement officer to act within Indian country implicates questions of jurisdiction and tribal sovereignty, not the Fourth Amendment. *See State v. Cummings*, 2021 S.D. 4, ¶ 24, 954 N.W.2d 731, 739 (holding that our prior decisions "incorrectly conflated jurisdictional principles associated with tribal sovereignty and individual rights afforded by the Fourth Amendment").

Evans failed to establish the jury selection process resulted in an unfair trial. *Id.* ¶¶ 40, 42, 956 N.W.2d at 84.

[¶18.] And as to Evans' argument relating to the other acts evidence, we held that the circuit court did not abuse its discretion by allowing testimony from Evans' ex-wife despite the passage of time since the incidents occurred. *Id.* ¶¶ 34–35, 956 N.W.2d at 82. The other acts testimony from Evans' ex-wife recounted events that were "strikingly similar" to the offenses described by S.B. and fit within the permissible purposes of Rule 404(b) that authorize evidence of common scheme or plan, motive, and intent. *Id.* ¶¶ 32–35, 956 N.W.2d at 81–82.

***The habeas action***

[¶19.] In his habeas corpus petition, Evans alleged nine claims:

(1) Evans' right to effective assistance of counsel was violated when his trial counsel, Ellery Grey, failed to call Lisa Anderson as a witness.

(2) Evans' right to effective assistance of counsel was violated when Grey failed to call Evans to testify in his own defense.

(3) Evans' right to effective assistance of counsel was violated when Grey failed to object to the alleged errors during jury selection.

(4) Evans' right to effective assistance of counsel was violated when Grey failed to ensure Evans was present during an in-chambers meeting regarding jury selection.

(5) Evans' right to effective assistance of counsel was violated when Grey did not use certain evidence, specifically, phone records, at trial.

(6) Evans' right to effective assistance of counsel was violated when Grey failed to investigate and call S.B.'s ex-husband to impeach S.B.

(7) Evans' right to effective assistance of counsel was violated when Grey failed to investigate S.B.'s claimed injuries and their cause.[4]

(8) Evans' due process rights were violated when the circuit court admitted other acts evidence prior to issuing a limiting instruction.

(9) Evans' right to be free from unreasonable searches and seizures was violated when state law enforcement officers seized his vehicle and searched his hotel room without a tribal warrant.

[¶20.] In June 2022, the State moved to dismiss claims 3, 8, and 9, pursuant to SDCL 15-6-12(b)(5), alleging the claims were barred by the doctrine of res judicata since they had been resolved in Evans' direct appeal. The habeas court agreed and granted the State's motion.

[¶21.] The habeas court conducted an evidentiary hearing on the remaining ineffective assistance claims in August 2023. At the hearing, Grey, Evans, and Grey's law partner, Paul Eisenbraun, testified. Grey testified that his trial strategy was to place S.B.'s credibility at issue and argue that the sexual encounter with Evans on September 6 was a consensual act between two people who remained involved in a turbulent, sometimes intimate, relationship. While he acknowledged that he "could have" made certain decisions, such as calling a particular witness or utilizing other evidence, Grey explained that the decisions he made were strategic ones that he believed furthered his defense.

[¶22.] In a memorandum decision, the habeas court denied Evans' ineffective assistance claims and dismissed his petition. The court issued a certificate of

---

4. Evans indicated he would not pursue claim 7 during the evidentiary hearing.

probable cause, noting both its res judicata ruling and its decision to deny relief on the merits of Evans' ineffective assistance claims.[5]

## Analysis and Decision

### *Res judicata and Evans' claim relating to jury selection (claim 3)*

[¶23.]     "[H]abeas corpus actions are exceptional in the sense that they represent post-conviction, collateral attacks on otherwise final judgments of conviction." *Ceplecha v. Sullivan*, 2023 S.D. 63, ¶ 25, 998 N.W.2d 351, 357–58 (citing *Piper v. Young*, 2019 S.D. 65, ¶ 21, 936 N.W.2d 793, 803–04 (*Piper IV*)). Consequently, "not all alleged errors are cognizable in a habeas action." *Id.* ¶ 26, 998 N.W.2d at 358. Claims, or "necessary constituent parts of them," that were "either litigated on direct appeal or could have been . . . are subject to preclusion in a subsequent habeas action under the doctrine of res judicata." *Id.*

[¶24.]     We have often described the distinct issue preclusion and claim preclusion aspects of res judicata:

> Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided . . . . Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a

---

5.     Although the caption to the certificate of probable cause contains a reference to claim 6, the text of the actual certificate does not. This is fatal to our appellate jurisdiction. We do not have authority to review a circuit court's decision to deny or dismiss a habeas petition in all cases. SDCL 21-27-18.1. We obtain appellate jurisdiction only through the issuance of a certificate for probable cause that provides "specific showing" for appellate review. *Lange v. Weber*, 1999 S.D. 138, ¶ 12, 602 N.W.2d 273, 276. The fact that both parties have briefed the merits of claim 6 (relating to Grey's decision not to call S.B.'s ex-husband) does not change this uncomplicated jurisdictional analysis. *See Long v. Knight Const. Co.*, 262 N.W.2d 207, 209 (S.D. 1978) (holding parties cannot create appellate jurisdiction by stipulation or agreement).

> determination that it should have been advanced in an earlier suit[.]

*Id.* (alterations in original); *see also Ramos v. Weber*, 2000 S.D. 111, ¶ 8, 616 N.W.2d 88, 91 (applying claim preclusion to bar a petitioner's claim that could have been litigated on direct appeal but was not).

[¶25.]       On direct appeal, we considered the following arguments regarding jury selection:

> (1)    the circuit court failed to follow SDCL 23A-20-6 when it summarily excused jurors on its own, rather than after counsel conducted voir dire and challenged the jurors for cause
>
> (2)    the court failed to follow the dictates of chapter 23A-20 by not inquiring into whether any of the excused jurors' work-related issues could be accommodated or whether they could set aside any preconceptions and follow the court's instructions regarding the State's burden, the presumption of innocence, or the jury's role in deciding a case based on the evidence admitted at trial.

*Evans I*, 2021 S.D. 12, ¶ 38, 956 N.W.2d at 83.

[¶26.]       We rejected both arguments for a number of reasons, but Evans argues we did so only because his attorney failed to object to what he claimed were instances in which the circuit court's method of jury selection strayed from statutory standards.  In this regard, Evans contends that he is not challenging our previous holdings but, rather, his trial counsel's failure to object to what he believes to be irregularities in the jury selection process.

[¶27.]       On general principles, this distinction between judicial error and defense counsel performance does exist, as our cases recognize.  *See State v. Wilson*, 2020 S.D. 41, ¶ 28, 947 N.W.2d 131, 139; *Neels v. Dooley*, 2022 S.D. 4, ¶ 14, 969

N.W.2d 729, 734.  But, here, the distinction is not meaningful because Evans

overlooks a critical aspect of our analysis in *Evans I*.

[¶28.]　　　Notwithstanding the fact that Grey chose not to object to aspects of the

circuit court's jury selection process that did not entirely comport with certain

statutory standards, Evans did not prevail on direct appeal for a more fundamental

reason:

> Notably, although Evans identifies instances where, in his view,
> the court's jury selection process deviated from chapter 23A-20,
> *he does not identify in what manner the court's process resulted*
> *in a substantial failure to comply with the statutes, namely how*
> *the jury selection process necessarily rendered the trial*
> *fundamentally unfair*.  The process by which the court examined
> the potential jurors did not deprive the State or Evans's counsel
> of the opportunity to determine whether prospective jurors
> possessed beliefs that would cause them to be biased in such a
> manner as to prevent Evans or the State from obtaining a fair
> and impartial trial.  The court examined each juror in the
> presence of counsel, and on two occasions while in chambers, the
> court, when requested, allowed counsel to ask further questions
> to demonstrate or negate juror bias.

*Evans I*, 2021 S.D. 12, ¶ 42, 956 N.W.2d at 84–85 (cleaned up) (emphasis added).

[¶29.]　　　In other words, Evans failed to demonstrate a constitutional violation

associated with the circuit court's process for jury selection.  We cannot understand

how Evans could prevail on his claim that Grey was ineffective for not objecting

during jury selection without relitigating our determination that he failed to show

"how the jury selection process necessarily rendered the trial fundamentally

unfair."[6]  *Id.*; *see also Neels*, 2022 S.D. 4, ¶ 13, 969 N.W.2d at 734 (stating that

---

6.　　"We have adopted the test for ineffective assistance of counsel set forth in
　　　*Strickland v. Washington*: first, the defendant must show that counsel's
　　　performance was so deficient that he was not functioning as 'counsel'

(continued . . .)

"[u]nder *Strickland*, 'the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged'" (citing *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069)).

[¶30.] Therefore, even if Grey's decision not to object to the jury selection procedures fell below an objective standard of reasonableness, which we do not hold, Evans cannot establish prejudice because we determined on direct appeal that the method of jury selection did not transgress his constitutional fair trial right.[7] We affirm the habeas court's decision to dismiss Evans' third claim under the doctrine of res judicata.[8]

### Ineffective assistance of counsel claims

[¶31.] Among its other enumerated protections, the Sixth Amendment of the United States Constitution guarantees an accused the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also* S.D. Const. art. VI, § 7

---

guaranteed by the Sixth Amendment; and second, he must show that counsel's deficient performance prejudiced the defendant." *Steiner v. Weber*, 2011 S.D. 40, ¶ 6, 815 N.W.2d 549, 551–52 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)).

7. Evans suggests that we intimated deficient performance of his trial counsel when we noted in *Evans I* that counsel had not objected at certain points during the circuit court's voir dire and had passed the jury panel for cause. However, these references should not be read in this way. They were simply observations about the state of the record and nothing more.

8. As set out above, *supra* ¶ 19, Evans also alleged habeas claims challenging the circuit court's admission at trial of other acts evidence related through his ex-wife (claim 8) and the court's pretrial decision to deny Evans' motion to suppress evidence (claim 9). Both of these arguments were litigated on direct appeal and resolved adversely to Evans. In this habeas appeal, he acknowledges this but does not seriously argue that we can re-review these claims here. The State argues Evans has conceded that claim 8 and claim 9 are precluded, and Evans does not dispute that contention in his reply brief.

("In all criminal prosecutions the accused shall have the right to defend in person and by counsel[.]"). "We review a circuit court's determination of a Sixth Amendment ineffective assistance of counsel claim as a mixed question, reviewing the court's decision on the constitutional issue de novo and its findings of fact for clear error." *Reay v. Young*, 2019 S.D. 63, ¶ 13, 936 N.W.2d 117, 120 (citation omitted).

[¶32.]    As indicated above, *supra* note 6, we analyze ineffective assistance claims under the *Strickland v. Washington* two-pronged standard:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Reay*, 2019 S.D. 63, ¶ 13, 936 N.W.2d at 120 (alteration in original) (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

[¶33.]    *Strickland's* first prong represents an assessment of counsel's performance using "an objective standard of reasonableness." *Ally v. Young*, 2023 S.D. 65, ¶ 34, 999 N.W.2d 237, 250, *reh'g denied* (Jan. 19, 2024) (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064). As part of this inquiry, "[t]he petitioner must overcome a 'strong presumption' that counsel was competent." *Id.* (quoting *Piper IV*, 2019 S.D. 65, ¶ 50, 936 N.W.2d at 810).

[¶34.] "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Reay*, 2019 S.D. 63, ¶ 14, 936 N.W.2d at 121 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). Matters of trial strategy, including counsel's decision to not call a witness that was otherwise known and identified, are ill-suited to judicial review under *Strickland's* first prong. *See Lodermeier v. Class*, 1996 S.D. 134, ¶ 20, 555 N.W.2d 618, 625 (determining counsel's decision to not call a witness was part of counsel's trial strategy and did not amount to ineffective assistance). For this reason, we must act with restraint and not "second guess the decisions of experienced trial attorneys [on] matters of trial tactics unless the record shows that counsel failed to investigate and consider possible defenses[.]" *Ally*, 2023 S.D. 65, ¶ 34, 999 N.W.2d at 250 (quoting *Randall v. Weber*, 2002 S.D. 149, ¶ 7, 655 N.W.2d 92, 96).

[¶35.] The second prong of the *Strickland* standard assesses the impact of counsel's error and is established when the petitioner shows that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* ¶ 36 (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068); *see also Reay*, 2019 S.D. 63, ¶ 15, 936 N.W.2d at 121. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Reay*, 2019 S.D. 63, ¶ 15, 936 N.W.2d at 121. Establishing only that counsel's deficient performance "had some conceivable effect on the outcome of the proceeding" is insufficient to satisfy prong two of the *Strickland* test. *Harrington v.*

*Richter*, 562 U.S. 86, 104, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011) (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2052). A petitioner must, instead, demonstrate that his attorney's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064.

[¶36.] Evans argues Grey was ineffective for failing to utilize evidence at his disposal, including Evans' own testimony as well as the testimony of his sister, Lisa Anderson. Evans also contends Grey should have sought to introduce telephone records to establish a history of telephone contact between Evans and S.B. In Evans' view, this evidence "should have been used to attack S.B.'s credibility, establish her motive to fabricate, and demonstrate Evans' innocence." We address each item of evidence relative to Grey's performance.

### A. Lisa Anderson and the telephone records

[¶37.] Evans suggests that Lisa Anderson had information about his relationship with S.B. that would have countered what he perceived to be S.B.'s claim that he was simply "an employee who became obsessed with [S.B.] and attacked her[.]" According to Evans, the evidence would have demonstrated, instead, that the two were involved in a romantic relationship from the outset. Anderson could have explained that Evans and S.B. were a couple who had interacted with Evans' family. In Evans' view, the telephone records would have provided information about the frequency of communication, or efforts to communicate, between Evans and S.B.

[¶38.] Grey testified that he understood what Anderson knew, which included the fact that Anderson could have testified about S.B.'s efforts to have the earlier simple assault and false imprisonment charges against Evans dismissed. Still, in Grey's assessment, Anderson's testimony was unnecessary:

> So the rationale that I would have for you is this. Towards the end of the trial we had done the cross-examination of [S.B.]. My hope was is [sic] that the jury was having doubts about her testimony. I believed we had also had - - Attorney Elizabeth Fredrickson (sic) had also testified by that point, and so the nature of the romantic relationship had been established, the fact that it was tumultuous had been established.
>
> ****
>
> [B]ut in my estimation they would have been redundant to things I thought had already been fairly well established. So my concern was, under cross-examination would there be other facts that might be harmful to the case to the defense that might come out.

(Third alteration in original.)

[¶39.] We conclude that Grey's decisions not to call Anderson or seek to admit the telephone records were reasonable. His cross-examination of S.B. established the key facts that Grey viewed as important to his defense theory. S.B. admitted that she and Evans had a romantic relationship that began after they met through an online dating platform. S.B. also acknowledged that she and Evans had interacted with Evans' family as a couple and that the two had been together romantically after she moved from her Rapid City home. And though she denied trying to conceal her relationship with Evans from her ex-husband, S.B. admitted on cross-examination that she would forgo monthly alimony payments of $2,500 if her ex-husband established she was cohabitating with Evans. This was consistent

with Grey's trial strategy that S.B. often feigned efforts to distance herself from Evans in order to preserve the appearance she was not cohabitating with him.

[¶40.] Evans is critical of Grey's reliance upon attorney Frederick's testimony, citing the fact that Grey acknowledged that calling her had "backfired" to some extent. Though Frederick testified that S.B. contacted her and stated she did not want to pursue simple assault and false imprisonment charges against Evans, Grey explained that Frederick's cross-examination took an unexpected turn when "she was permitted to be turned into kind of almost into an expert witness to talk about generally how people will or women that are battered might withdraw their claims and that type of thing." However, Grey still viewed Frederick as a helpful witness to the defense "on balance[ ]." Viewing Grey's performance from a real-time perspective and not with the benefit of hindsight, his decision was reasonable.

### B. Grey's failure to call Evans to testify[9]

[¶41.] A defendant's right to not be compelled to testify is an essential right afforded to all criminal defendants. U.S. Const. amend. V; S.D. Const. art. 6, § 9. A defendant has a complementary right *to* testify, which is derived from the Sixth and Fourteenth Amendments. *Wilcox v. Leapley*, 488 N.W.2d 654, 658 (S.D. 1992) (citation omitted). The accused, not his attorney, has the ultimate authority to

---

9. During his testimony at the evidentiary hearing before the habeas court, Evans testified Grey actually *prevented* him from testifying. However, as it is formulated in his petition and on appeal, Evans' ineffective assistance of counsel claim is that Grey merely *failed* to call him as a witness after advising him not to testify. We accept this latter version of the argument as the one raised in the submissions and referenced in the certificate of probable cause.

decide whether to waive the right against self-incrimination and testify at his trial. *Id.* (citation omitted). However, a decision to testify can bring with it great risk, and defense counsel may properly advise a client against testifying. *See id.* at 659.[10]

[¶42.] Grey acknowledged that the decision to testify was one for Evans alone, but Grey also explained that defendants rely on the advice of counsel when deciding whether to testify. Here, Grey advised Evans against testifying. In Grey's view, Evans' effort to refute testimony from S.B. and his ex-wife would have created significant problems for Evans on cross-examination, in part, because Evans had been convicted of violating a protection order in connection with some of the incidents described by his ex-wife:

> I don't know that it would be his denial, his testifying and saying that's not what happened. I guess my concern was, ultimately, he did plead guilty to something, and that would be my concern about how the cross-examination would have gone, at least that's how I would have done it if I would have been the prosecution.

[¶43.] More directly related to the charges involving S.B., Grey was concerned about the manner in which Evans described his trip to the Hermosa property:

> As I recall, what [Evans] explained to me is that he did drive out to [S.B.'s] home that night, had parked the truck some distance from the house and then had walked through a field, came to the house and then came to be underneath her bedroom window, as I recall. Then I believe he told me that he overheard [S.B.] and

---

10. It does not appear from our review of the record that the circuit court or Grey discussed the fact that Evans would not testify. We have held that a court is not obligated to establish on the record that a defendant has knowingly and voluntarily waived his right to testify. *See Wilcox*, 488 N.W.2d at 659 (citing cases).

Marshal Daggett engaging in sex. I don't know that he said he saw that, but I think he said that he heard that. Then after he left he then went into the home, so [Evans] then goes into the home.

****

Well, so the defense would be that [S.B.] wants him to come out, and because there's this protection order he can't be caught coming out. That would be one interpretation of the evidence. On the other hand it could cut against us because, as I recall, the vehicle was half spray painted and he's - - the argument that the state could have made is that he was trying to hide the vehicle and sneak out to the residence. So if he were to take the stand, those would be questions that I as a prosecutor would have asked him, and that - - even if there's an innocent explanation for that conduct the cross-examination could make someone look guilty for that reason, and that was my concern is is [sic] that a jury might be scrutinizing that type of testimony and would go back into deliberations and might focus on that type of testimony as opposed to [S.B.][.]

****

So it puts him at the scene of the alleged crime, and it puts him in close proximity to the window. You know, our defense was that he didn't enter through there, that he didn't cut the screen. So my concern was is [sic] that through cross-examination that that could potentially undermine the position we were taking.

[¶44.]    In our view, Grey's decision was reasonable. Evans' testimony would have come at considerable risk. And by engaging in a detailed rebuttal of the claim of S.B. and his ex-wife, Evans would have likely broadened the scope of the issues before the jury. This was inconsistent with Grey's trial strategy which was to narrow the jury's credibility focus to S.B. whose testimony he had successfully

impeached, as opposed to expanding the defense into a comparison of relative credibility between S.B. and Evans.[11]

### *Prejudice*

[¶45.] Evans could not satisfy *Strickland's* prejudice requirement to show a reasonable probability of a different outcome, even without regard to Grey's performance. There is no offer of proof regarding Anderson's proposed testimony, and the information that does exist in the record would essentially replicate evidence of a somewhat tempestuous, on-again-off-again romantic relationship between S.B. and Evans. And the phone records would have established only contacts, or attempted contacts, between them without evidence of content or further context.

[¶46.] Nor can Evans demonstrate prejudice concerning Grey's advice against Evans testifying. Evans' parochial belief that his testimony would have corrected all of the inaccuracies he believed were related by S.B. and his ex-wife while narrating the definitive account of what happened at S.B.'s home in Hermosa likely overstates the impact of any such testimony balanced against the entire record. It also overlooks the real risks he faced on cross-examination, as indicated above. Evans' own account placed him under the window with the cut screen after having parked his partially spray-painted truck a significant distance away before surreptitiously making his way to S.B.'s home.

---

11.    Evans' certificate of probable cause also asserts that Grey failed to ensure Evans' presence during an in-chambers voir dire discussion (claim 4). However, as the State notes, Evans' brief does not contain any argument that the habeas court erred when it denied this claim. Therefore, Evans has seemingly abandoned this claim on appeal.

## Conclusion

[¶47.]    Evans' claims 3, 8, and 9 were resolved in his direct appeal and are barred by the doctrine of res judicata.  Further, Evans has failed to establish that Grey was ineffective for not calling Lisa Anderson, not seeking to introduce cell phone records, and for not calling him to testify in his own defense.  We affirm.

[¶48.]    JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.